**FILED - GR**

September 26, 2008 2:24 PM

RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY           rmw     /

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEROME WESTFIELD DEWALD,

      Petitioner,               ED MI No.

-vs-

GENE L. WRIGGELSWORTH, Sheriff,
 Ingham County Jail,

      Respondents.
_____/

**1:08-cv-906**

Paul L Maloney - Chief U.S. District Judge
Joseph G Scoville - U.S. Magistrate Judge

**BRIEF IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT I  . . . . . . . . . . . . . . . . . . . . . . . . .  12

PETITIONER'S CONVICTIONS FOR FALSE PRETENSE, COMMON
LAW FRAUD, AND LARCENY BY CONVERSION ALL STEM FROM
ACTIVITY INVOLVING FEDERAL CAMPAIGN FINANCE.  SINCE
THIS FIELD IS COVERED BY A FEDERAL STATUTE, WHICH
PREEMPTS STATE LAW, HIS CONVICTIONS MUST BE VACATED.

A.   The Federal Election Campaign Act explicitly
     preempts the charges  . . . . . . . . . . . . . . .  13

     (1)  Larceny by Conversion (commercial use of
          donor lists) . . . . . . . . . . . . . . . . .  13

     (2)  Common Law Fraud and False Pretenses . . . . .  16

B.   Congress intended FECA to occupy the entire field
     of federal campaign finance . . . . . . . . . . .  18

C.   Conflicts between state and federal law
     necessitate preemption  . . . . . . . . . . . . .  21

D.   FECA preempts state police powers to prosecute
     fraud . . . . . . . . . . . . . . . . . . . . . . .  22

E.   State, rather than federal, prosecution of
     Petitioner's conduct produced draconian results
     in this case  . . . . . . . . . . . . . . . . . . .  25

F.   The instant challenge is cognizable as a federal
     habeas claim under 28 USC §2254 . . . . . . . . .  28

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . 29

    THE DEFENDANT'S CONVICTIONS OF FALSE PRETENSES AND
    COMMON LAW FRAUD MUST BE VACATED BECAUSE THE CONTEXT-
    BASED STANDARD USED TO CONVICT THE DEFENDANT FOR
    MISREPRESENTING HIS AFFILIATION INFRINGES UPON HIS
    FIRST AMENDMENT RIGHTS TO FREEDOM OF ASSOCIATION AND
    TO POLITICAL ADVOCACY.

ARGUMENT III . . . . . . . . . . . . . . . . . . . . . . . . 45

    THERE WAS INSUFFICIENT EVIDENCE TO CONVICT PETITIONER
    OF FALSE PRETENSES, COMMON LAW FRAUD, OR LARCENY BY
    CONVERSION, AND AS SUCH, THESE CONVICTIONS ARE IN
    VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW.

    A.    False Pretenses and Common Law Fraud . . . . . . . 45

        (1)   There was insufficient evidence to convict
              Mr. Dewald of false pretenses and common
              law fraud . . . . . . . . . . . . . . . . . . 45

        (2)   The common law fraud charge should be
              reversed because the Bush and Gore campaigns
              suffered no harm from the alleged fraud . . . 57

    B.    Larceny by Conversion . . . . . . . . . . . . . . . 60

        (1)   There was insufficient evidence to prove
              Mr. Dewald intended to defraud the owner
              of the property . . . . . . . . . . . . . . . 60

        (2)   There was insufficient evidence to that
              the property had a value over $20,000, or
              any value at all . . . . . . . . . . . . . . . 64

ARGUMENT IV . . . . . . . . . . . . . . . . . . . . . . . . . . 68

        PETITIONER WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A
        FUNDAMENTALLY FAIR TRIAL AND HIS DUE PROCESS RIGHT TO
        PRESENT A DEFENSE WHERE THE TRIAL COURT ALLOWED THE
        PROSECUTION TO INTRODUCE IMPROPER EXPERT TESTIMONY
        INVOLVING LEGAL CONCLUSION AND IMPROPER CONCLUSIONS AS
        TO ULTIMATE FACTS, AND WHERE THE TRIAL COURT PRECLUDED
        PETITIONER FROM PRESENTING MATERIAL, EXPERT DEFENSE
        EVIDENCE.

        A.    Impermissible prosecution testimony as to
              legal conclusions and ultimate facts  . . . . . . . 68

        B.    The trial court's preclusion of defense
              testimony . . . . . . . . . . . . . . . . . . . . . 74

RELIEF REQUESTED  . . . . . . . . . . . . . . . . . . . . . . . 80

**INDEX OF AUTHORITIES**

**CASES**                                                              **PAGE(S)**

<u>Austin</u> v <u>Mich</u> <u>Chamber</u> <u>of</u> <u>Com</u>, 494 US 652 (1990) . . . . . . .  31

<u>Banks</u> v <u>Wolfe</u> <u>Co</u> <u>Bd</u> <u>of</u> <u>Educ</u>,
330 F3d 888 (6th Cir 2003) . . . . . . . . . . . . . . . . .  39

<u>Belle</u> <u>Isle</u> <u>Grill</u> <u>Corp</u> v <u>City</u> <u>of</u> <u>Detroit</u>,
256 Mich App 463 (2003) . . . . . . . . . . . . . . . .  47, 57

<u>Brown</u> v <u>O'Dea</u>, 227 F3d 642 (6th Cir 2000) . . . . . . . . . .  68

<u>Buckley</u> v <u>Valeo</u>, 424 US 1 (1976) . . . . . . . . . . . .  <u>passim</u>

<u>Bugh</u> v <u>Mitchell</u>, 329 F3d 496 (6th Cir 2003) . . . . . . . . .  68

<u>Bunning</u> v <u>Kentucky</u>, 42 F3d 1008 (1994) . . . . . . . . . . .  20

<u>California</u> <u>Democratic</u> <u>Party</u> v <u>Jones</u>, 530 US 567 (2000) . . .  37

<u>Chamber</u> <u>of</u> <u>Com</u> <u>of</u> <u>US</u> v <u>Moore</u>,
288 F3d 187 (5th Cir 2002) . . . . . . . . . . . . . . .  37, 38

<u>Chambers</u> v <u>Mississippi</u>, 410 US 284 (1973) . . . . . . . .  68, 79

<u>Chappel</u> v <u>Montgomery</u> <u>Co</u> <u>Fire</u> <u>Protec</u> <u>Dist</u> <u>No.</u> <u>1</u>,
131 F3d 564 (6th Cir 1997) . . . . . . . . . . . . . . . . .  39

<u>Cipollone</u> v <u>Liggett</u> <u>Group</u>, <u>Inc.</u>, 505 US 504 (1992) . . .  12, 28

<u>Citizens</u> <u>for</u> <u>Responsible</u> <u>Govt</u> <u>State</u> <u>PAC</u> v <u>Davidson</u>,
236 F3d 1174 (10th Cir 2002) . . . . . . . . . . . . . . . .  37

<u>Connick</u> v <u>Suzuki</u> <u>Motor</u> <u>Co.</u>, 174 Ill 2d 482 (1996) . . . . . .  41

<u>Ege</u> v <u>Yukins</u>, 485 F3d 364 (6th Cir 2007) . . . . . . . . . .  68

<u>English</u> v <u>Gen</u> <u>Elec</u> <u>Co.</u>, 496 US 72 (1990) . . . . . . . . . .  28

<u>Faucer</u> v <u>FEC</u>, 928 F2d 468 (1st Cir 1991) . . . . . . . . . .  37

<u>Federal</u> <u>Election</u> <u>Commn</u> v <u>American</u> <u>Intl</u> <u>Demographic</u> <u>Serv</u>,
629 F Supp 317 (ED Va. 1986) . . . . . . . . . . . . . .  13, 25

iv

Friends of Phill Gramm v Americans for Phil Gramm in '84,
587 F Supp 769 (ED VA 1984) . . . . . . . . . . . . . . 23, 24

Galliano v US Postal Serv, 836 F2d 1362 (1988) . . . . . passim

Gustafson v City of Lake Angelus, 76 F3d 778 (6th Cir 1996) . 23

Huff v United States, 273 F2d 56 (5th Cir 1959) . . . . . . . 72

Illinois ex rel Madigan v Tel Mktg Assoc,
538 US 600 (2003) . . . . . . . . . . . . . . . . . . . . passim

Iowa Right to Life v Williams, 187 F3d 963 (8th Cir 1999) . . 37

Jackson v Virginia, 443 US 307 (1979) . . . . . . . . . . . 45

Karl Rove & Co v Thornburgh, 39 F3d 1273 (1994) . . . . . . 18

Maloney v Alice, 251 Ill 3d 51 (1993) . . . . . . . . . . . 41

Marx & Co., Inc. v Diners' Club, Inc.,
550 F2d 505 (2d Cir 1977) . . . . . . . . . . . . . . . . . 72

McConnell v Federal Elections Commn, 540 US 93 (2003)  36, 37, 38

McIntyre v Ohio Elections Commn, 514 US 334 (1995) . . . . . 29

Meese v Keene, 481 US 465 (1987) . . . . . . . . . . . . . 36

Michigan Canners & Freezers Assn, Inc, v Agric Mktg and Bargaining
Bd, 467 US 461 (1984) . . . . . . . . . . . . . . . . . 12, 28

NAACP v Button, 371 US 415 (1963) . . . . . . . . . . . . 31, 34

NAACP v Patterson, 357 US 449 (1958) . . . . . . . . . . . 31

Ogden v Marendt, 264 F Supp 2d 785 (SD Ind 2003) . . . . . . 35

People v Pickett, 14 Mich App 1 (1968) . . . . . . . . . . . 56

People v Dewald, 267 Mich App 365 (2005) . . . . . . . . 28, 45

People v Drossart, 99 Mich App 66 (1980) . . . . . . . . . . 71

People v Flaherty, 165 Mich App 113 (1988) . . . . . . . . . 47

People v Jory, 443 Mich 403 (1993) . . . . . . . . . . . . . 30

People v Lyons, 93 Mich App 35 (1979) . . . . . . . . 71, 72, 73

People v Matulonis, 115 Mich App 263 (1982) . . . . . . . . . 72

People v Merritt, 396 Mich 67 (1976)  . . . . . . . . . . . . 79

People v Miciek, 106 Mich App 659 (1981)  . . . . . . . . 60, 75

People v Peach, 174 Mich App 419 (1989) . . . . . . . . . . . 47

People v Pohl, 202 Mich App 203 (1993)  . . . . . . . . . . . 14

People v Scott, 71 Mich App 16 (1976) . . . . . . . . . . . . 60

People v Vida, 381 Mich 595 (1969)  . . . . . . . . . . . . . 57

Printz v United States, 521 US 898 (1997) . . . . . . . . . . 13

Reeder v Kansas City Bd of Police Commrs,
733 F2d 543 (8th Cir 1984)  . . . . . . . . . . . . . . . . . 23

Riley v Natl Fed of the Blind of N.C., Inc,
487 US 781 (1988) . . . . . . . . . . . . . . . . . . . . passim

Roth v United States, 354 US 476 (1957) . . . . . . . . . 32, 38

Rutan v Republican Party of Ill, 497 US 62 (1990) . . . . . . 35

Ryan v Brunswick Corp, 209 Mich App 519 (1995)  . . . . . . . 23

Talley v California, 362 US 60 (1960) . . . . . . . . . . . . 39

Tart v Commw of Mass,
949 F2d 490 (1st Cir 1991)  . . . . . . . . . . . . . . . . . 28

Teper v Miller, 82 F3d 989 (1996) . . . . . . . . . . 19, 22, 22

Thomas v Collins, 323 US 516  (1945)  . . . . . . . . . . 36, 37

Treas Comm to Elect Gerald D. Lostracco v Fox,
150 Mich App 617 (1986) . . . . . . . . . . . . . . . . . . . 44

US v Hsia, 176 F3d 517 (DC Cir 1999)  . . . . . . . . . . . . 25

USv Hsia, 24 F Supp 2d 33 (D DC 1998) . . . . . . . . . . . . 25

US v Kokinda, 497 US 720 (1990) . . . . . . . . . . . . . . . 31

vi

<u>US</u> v <u>Tonry</u>, 433 F Supp 620 (ED La 1977) . . . . . . . . . . . 13

<u>Vanasco</u> v <u>Schwartz</u>, 506 F2d 524 (2d Cir 1974), on remand, 401 F Supp 87 (SD NY 1975), aff'd, 423 US 104 (1976) . . 32, 34

<u>Vermont</u> <u>Right</u> <u>to</u> <u>Life</u> v <u>Sorrel</u>, 221 F3d 376 (2d Cir 2000) . . 37

<u>Watchtower</u> <u>Bible</u> <u>and</u> <u>Tract</u> <u>Socy</u> <u>of</u> <u>NY</u> v <u>Village</u> <u>of</u> <u>Stratton</u>, 536 US 150 (2002) . . . . . . . . . . . . . . . . 39

<u>Watts</u> v <u>Quarterman</u>, 448 F Supp 2d 786 (WD Tex 2006) . . . . . 44

<u>Wayne</u> <u>Co</u> <u>Bd</u> <u>of</u> <u>Commrs</u> v <u>Wayne</u> <u>Co</u> <u>Airport</u> <u>Auth</u>, 253 Mich App 144 (2002) . . . . . . . . . . . . . . . . . . . 28

**CONSTITUTIONS, STATUTES, COURT RULES**          **PAGE(S)**

US Const Art II, §3 . . . . . . . . . . . . . . . . . . . . . 16

US Const Amend I . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

US Const Amend VI . . . . . . . . . . . . . . . . . . . . 74, 79

US Const Amend XIV . . . . . . . . . . . . . . . . . . . . 9, 68

1 USC §453 . . . . . . . . . . . . . . . . . . . . . . . . . 13

2 USC §432(b)(4) . . . . . . . . . . . . . . . . . . . . . . 18

2 USC §437(g) . . . . . . . . . . . . . . . . . . . . . . . . 13

2 USC §437g(d)(1)(A) . . . . . . . . . . . . . . . . . . . . 27

2 USC §437g(a)(6)(C) . . . . . . . . . . . . . . . . . . . . 26

2 USC §438(a)(4) . . . . . . . . . . . . . . . 14, 15, 27, 28, 68

2 USC §441j(b) . . . . . . . . . . . . . . . . . . . . . . . 25

2 USC §441j(c)(2) . . . . . . . . . . . . . . . . . . . . . . 25

28 USC §516 . . . . . . . . . . . . . . . . . . . . . . . . . 13

28 USC §2244 . . . . . . . . . . . . . . . . . . . . . . . . 10

28 USC §2254 . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

28 USC §2254(b) . . . . . . . . . . . . . . . . . . . . . . . 10

28 USC §2254(d)(1)  . . . . . . . . . . . . . . . . . . . <u>passim</u>

28 USC §2254(d)(2)  . . . . . . . . . . . . . . . . . . . .  10

2002 Acts.Pub.L. 107-155, Title III, §312(b), 3/27/02,
116 Stat. 106 . . . . . . . . . . . . . . . . . . . . . . .  25

H.R. Report No. 93-1438, 93d Cong., 2d Session 69 (1974)  . .  19

11 CFR §102.14  . . . . . . . . . . . . . . . . . . . . . .  18

11 CFR §104.15  . . . . . . . . . . . . . . . . . . . . . .  15

11 CFR 108.7  . . . . . . . . . . . . . . . . . . . 19, 20, 21

11 CFR § 108.7(b)(1)  . . . . . . . . . . . . . . . . . . .  21

11 CFR § 108.7(b)(2)  . . . . . . . . . . . . . . . . . . .  21

11 CFR §108.7(c)(4) . . . . . . . . . . . . . . . . . . . .  21

MCL 750.218 . . . . . . . . . . . . . . . . . . . . 7, 1, 16, 46

MCL 750.280 . . . . . . . . . . . . . . . . . . . . 7, 1, 16, 46

MCL 750.362 . . . . . . . . . . . . . . . . . . . . . 7, 1, 60

MCL 750.362a  . . . . . . . . . . . . . . . . . . . . . . .  60

MCL 763.1 . . . . . . . . . . . . . . . . . . . . . . . . .  78

MCR 6.500 . . . . . . . . . . . . . . . . . . . . . . . .  8-10

MRE 401 . . . . . . . . . . . . . . . . . . . . . . . . . .  76

MRE 403 . . . . . . . . . . . . . . . . . . . . . . . . . .  72

MRE 602 . . . . . . . . . . . . . . . . . . . . . . . . . .  72

Black's Law Dictionary (7th ed.)  . . . . . . . . . . . . .  34

Gillespie, Michigan Criminal Law and Procedure, §86.15  . . .  47

viii

## Statement of Facts:

Jerome Dewald was charged with two counts of obtaining money under false pretenses, MCL 750.218, two counts of common law fraud, MCL 750.280, and two counts of larceny by conversion, MCL 750.362. The charges arose out of his activities as operator and director of two Political Action Committees ("PACs"), Friends for a Democratic White House (hereinafter "Friends"), and Swing States for a GOP White House (hereinafter "Swing States").   In June, 2003, Dewald was tried by jury in the Circuit Court for the County of Ingham, before Honorable William E. Collette, and he was convicted of all counts.   On November 13, 2003, Judge Collette sentenced him to 16 to 60 months on the first count of false pretenses, 90 days on the second count of false pretenses, and 23 months to 120 months on the remaining charges, all to run concurrent.

During the 2000 Bush vs. Gore presidential campaign, Dewald registered two PACs, Swing States (on October 19, 2000) and Friends (on November 3, 2000), with the Federal Election Commission ("FEC").   (Jones, Trial Tr 6/23/03, pp 175-176, Motley, Tr 6/24/03, p 247).   He also set up a corporation with the State of Michigan, called PAC Services, to provide consulting and administrative services to the two PACs.   (Motley, Tr 6/23/03,  p 209, Tr 6/24/03, pp 247-248).

The two PACs mailed out letters soliciting political contributions during the election campaign and the vote recount

1

that followed. (Jones, Tr 6/23/03, p 138; Sharpe, Tr 6/24/03, p 379; Tringali, Tr 6/26/03, pp 451-452; Westover, Tr 6/26/03, pp 465-466; Miller, Tr 6/26/03, pp 479-480). Initial solicitations from Swing States stated: "We are calling on a select few of the most generous individual supporters of George W. Bush in these last days of the 2000 campaign to help raise a final $1 million before October 26 to capture the electoral votes in these critical swing states." Exhibit A, appended, "Swing States" initial solicitation letter. The solicitation from Friends made a similar appeal "for the most generous individual supporters of Al Gore." Exhibit B, appended, "Friends" initial solicitation letter. During the vote recount period immediately following the election, the solicitations for Swing States called on "a select few of the most generous individual supporters of George W. Bush to help raise $3 million before December 1 to protect our hard-won victory." Exhibit C, appended, "Swing States" recount solicitation letter. The post-election fundraising letter from Friends used similar language to solicit "a select few of the most generous individual supporters of Al Gore." Exhibit D, appended, "Friends" post-election solicitation letter.

Solicitation from Friends mentioned Al Gore by name, and listed a mailing address on Pennsylvania Avenue in Washington D.C. (Sharpe, Tr 6/24/03, p 379; Miller, Tr 6/26/03, p 480; Thomas, Tr 6/26/03, p 502; Exhibits B and D). Solicitations from Swing States

2

mentioned George W. Bush, the GOP, and also listed a different Pennsylvania Avenue mailing address. (Jones, Tr 6/23/03, pp 140-141; Miller, Tr 6/26/03, p 452; Tringali, Tr 6/26/03, pp 494-496; Exhibits A, C). Contributions sent to the Washington, D.C. addresses of each PAC were forwarded to Lansing, Michigan. (Motley, Tr 6/24/03, pp 241-242; Thomas, Tr 6/26/03, pp 497-498, 504).

The two PACs received contributions in separate post office boxes and Mr. Dewald never commingled their money. (Motley, Tr 6/24/03, p 249; Thomas, Tr 6/26/03, pp 494-504). Swing States contributed $91,000 and Friends $36,000 to political organizations like the Michigan Democratic Party, the Michigan Republican Party and other state party PACs. (Motley, Tr 6/23/03, pp 226-227). The PACs only made contributions to political party organizations in the same states mentioned in the solicitation letter and registered with the FEC. Exhibit A. The contribution amounts represented 17-18% of the two PACs' receipts. (Motley, Tr 6/24/03, p 253). Swing States contributed solely to the Republican institutions and Friends solely to the Democratic ones. (Motley, Tr 6/24/03, p 284). Jeanette Hensler, the treasurer of Friends hired by Mr. Dewald, oversaw contributions of $5,000 each to the Michigan Democratic State Central Committee, Missouri Democratic State Committee, and Democratic Executive Committee of Florida. (Hensler, Tr 6/23/03, p 201).

3

Swing States contributed $20,000 to the Republican National Committee, $1,000 to Bush/Cheney 2000, $15,000 to the Bush/Cheney recount fund and $5,000 each to the state Republican Party organizations in Michigan, Missouri, Pennsylvania, Wisconsin, Florida, Tennessee, Arkansas, West Virginia, New Jersey, and Washington.  (Exhibit E, "Swing States" itemized disbursements). The FEC disbursements report for Swing States showed no contributions to Democratic organizations or committees. (Id.) Similarly, the FEC  disbursements report indicated that Friends contributed $20,000 to the Democratic National Committee, and $5,000 each to the state Democratic Party organizations in Michigan, Missouri, Florida, and Tennessee. (Exhibit F, "Friends" itemized disbursements).  The FEC disbursements for Friends showed no contributions to Republican organizations or committees.  (Id.)

According to Kenneth Jones, a lawyer for the Republican National Committee in the fall of 2000, Swing States sent a $10,000 cashier's check directly to the Republican National Committee (hereinafter "RNC"), but the RNC declined to cash the check. (Jones, Tr 6/23/03, pp 157-158).[1] Friends made a contribution to Gore/Lieberman 2000, which the Committee refunded due to a policy of not accepting money from PACs.  (Sharpe, Tr 6/24/03, pp 394-395).

---

1 Mr. Dewald maintains that the RNC never advised they were not cashing this check.

4

The two PACs collected approximately $750,000 from contributors and timely reported all these receipts in FEC disclosures. (Motley, Tr 6/23/03, pp 225-226). The Michigan Attorney General's Office seized $170,958 of this amount, which represented about 23% of the total collected. (Motley, Tr 6/24/03, p 254). The two PACs also distributed $189,440 to PAC Services, less than 25% of the funds raised. (Motley, Tr 6/23/03, p 229). Mr. Dewald formed PAC Services to provide services to Political Action Committees such as obtaining mailing lists, hiring staff to prepare mailings, and other administrative functions. (Motley, Tr 6/24/03, Tr 248).

The initial solicitations from each PAC offered participation in a raffle of tickets to the inaugural ball of the candidate the contributor supported. (Jones, Tr 6/23/03, p 141; Sharpe, Tr 6/24/03, p 377; Exhibits A, B). Attorney Kenneth Jones noted that it would have been legal for Dewald to purchase tickets to George W. Bush's inaugural ball and give them away. (Jones, Tr 6/23/03, pp 166-169).

On October 26, 2000, the Republican National Committee sent Mr. Dewald and Swing States a letter ordering them to stop implying an affiliation with the inaugural committee and to stop using the trademark "GOP." (Jones, Tr 6/23/03, pp 143-144; Exhibit G, RNC "cease and desist" letter). The letter cited federal regulations, 11 CFR §102.14, which prohibit the use of a candidate's name by a

5

committee not authorized by the candidate, and the use of public FEC disclosures for commercial purposes, such as soliciting contributions. (Id.) The subsequent solicitation letters from Swing States changed the name of the PAC to "Swing States for a Conservative White House" from "Swing States for a GOP White House." (Exhibit A,C). Similarly, the subsequent solicitation letters from both Swing States and Friends no longer offered Inaugural Ball tickets, substituting coffee mugs instead. (Exhibits A,B,C, and D).

The FEC maintains lists of contributors to national political campaigns and committees on its web site. Use of these lists for solicitations or other commercial purposes is prohibited by law, and the FEC web site has warnings to that effect. (Jones, Tr 6/23/03, p 145). This same information was available on a number of other web sites, including www.tray.com. (Motley, Tr 3/24/03, p 265; Graham, 6/24/03, pp 334-335; Sharpe, Tr 6/24/03, pp 405- 406).

Swing States sent solicitations to at least one "salt" name. which is a fictitious name inserted into the FEC donor lists in order to detect people using the list for commercial purposes. (Graham, Tr 6/24/03, pp 311, 339). Additional "salt" names planted by the Bush campaign appeared on the mailing lists for Swing States that Mr. Dewald turned over to the Michigan Attorney General. (Motley, Tr 6/23/03, p 210; Graham, 6/24/03, pp 365-366). These

6

same "salt" names also appeared on the disclosure lists available on the other web sites, like www.tray.com. (Motley, Tr 6/24/03, p 265; Graham, Tr 6/24/03, pp 335-336).

Alison Sharpe, a compliance officer for the Gore campaign, demonstrated that some of the solicitation letters from Friends duplicated typographical errors in names and addresses in their mailing list disclosed to the FEC. (Sharpe, 6/24/03, pp 390-392). These misspellings also appeared on other sites as well, including www.tray.com. (Id. 405-406).

According to Mark Grebner, a political consultant, the value of both the Bush and Gore campaign contribution lists was over $20,000. (Grebner, Tr 6/24/03, pp 429-430).

PAC Services transferred $150,000 to a bank account in the country of Cypress. (Motley, Tr 6/24/03, p 236). Mr. Dewald told Donovan Motley, the agent on the case, that he intended to use this money to purchase software overseas for PAC Services. (Id. 260). Mr. Dewald also told Motley that he intended to contribute at least 20% of his receipts to Democratic and Republican political institutions. (Id. 288-289).

The Office of the Attorney General's investigation revealed that a Swing States reported disbursement of $5,000 to a company called "American Political Lists" was made the same day Mr. Dewald gave his ex-wife, Lioudmila Volkova, a $5,000 check. (Motley, Tr 6/23/03, pp 214, 221; Motley, Tr 6/24/03, p 272). Swing States

sent an amendment to the FEC indicating that the $5,000 payment went to American Political Lists, care of L. Volkova. (Motley, Tr 6/23/03, pp 218-219). Other disbursements from Swing States and Friends went to additional mailings, rental car costs, staff salary, and Mr. Dewald's expenses. (Id. 225).

Dominick Tringali, a sanitation worker who donated $100 to Swing States, testified that he believed the solicitations had come from "The Bush people." (Tringali, Tr 6/26/03, pp 452, 457). On cross-examination, Tringali acknowledged that he would have been satisfied if the money had been contributed to Republican institutions. (Id. 462).

Kathleen Westover, a hospital worker who contributed $200 to Friends, testified that she believed the money would go to "some official body representing Democratic interests." (Westover, Tr 6/24/03, pp 464, 467). She agreed during cross-examination that she was contributing "to a political action committee and not directly to Gore." (Id. 474). Westover also understood that while ultimately the money would go to Democratic causes, "like any other donation, some of it goes to costs." (Id. 471). She made out her check to Friends PAC. (Id. 474).

Bruce Miller, an attorney, contributed $1,000 to Friends to assist Vice President Gore. (Miller, Tr 6/24/03, pp 478, 480). He believed the solicitation came from a committee on behalf of Vice President Gore. (Id. 480). Miller's check went to Friends PAC and

8

he acknowledged on cross-examination that he would have been satisfied had the money gone to the Gore campaign as anticipated. (Id. 484-485).

Tringali, Westover, and Miller all received letters and questionnaires from Special Agent Donovan Motley of the Criminal Division, on behalf of the Michigan Attorney General about their contributions. (Motley, Tr 6/24/03, pp 280-282; Tringali, Tr 6/24/03, p 458; Miller, Tr 6/24/03, p 484; Defendant's Exhibits H,I, J). The letters indicated that Mr. Dewald was the chief of staff of both Friends and Swing States, that the contributions were forwarded from Washington, D.C. to Lansing, Michigan, that the solicitation letters for each PAC were virtually identical, and that PAC Services operated each PAC. (Id.).

The letters from Special Agent Motley never explained that Friends contributed only to Democratic institutions and Swing States only to Republican institutions. (Motley, Tr 6/24/03, p 284). The letters never indicated that the money from the two PACs used for these disbursements never commingled. (Id. 284). The letters never noted that the PACs were properly registered with the FEC, or and that they had properly reported all their contributions and disbursements. (Id. 284); Exhibits E, Itemized Disbursements, Swing States PAC; Exhibit F, Itemized Disbursements, Friends PAC.

During his testimony, Bruce Miller explained that he only

became suspicious because the letter from the Attorney General's office told him that his money had been "appropriated for private purposes." (Miller, Tr 6/24/03, p 484). He believed this, "[b]ecause they told me." (Id. 484).

At the close of the prosecution's case, the defense moved for a directed verdict on several grounds involving duplicitous charges, sufficiency of the evidence, and the lack of an actual loss by any victims. (Counsel, Tr 6/26/03, pp 510-516). The Court denied the motion for the directed verdict. (Id. 516).

At the outset of the defense's case, the prosecution moved to strike the defense's only witness. The witness would testify that he had viewed and downloaded the FEC list from www.tray.com, a publicly available website, which had no admonishments against use of the data for commercial purposes. (Counsel, Tr 6/26/03, p 521). The Court granted the prosecution's motion and excluded the witness. (Court, Tr 6/26/03, pp 526-528).

The jury convicted Mr. Dewald of all six counts of criminal conduct. (Verdict, Tr 6/27/03, p 632). The court initially sentenced Mr. Dewald to concurrent terms of 24 to 60 months in prison for count one, 90 days in jail for count two, and 30 to 120 months in prison for counts three through six. (Sentence Hearing, Tr 9/3/03, p 26). The court also ordered Mr. Dewald to pay restitution in the amount of $536,727.75, the total receipts for

10

the two PACs, less the amount seized by the government. (Id. 26-27).

On November 13, 2003, there was a motion hearing that ended with a resentencing based on the Court's recalculation of the sentence guidelines. (Resentence Hearing, Tr 11/13/03, pp 14-15). Although the jury found Mr. Dewald guilty of common law fraud, in Counts 3 and 4, by defrauding victims -- the Bush and Gore campaigns (Verdict, Tr 6/27/03, p 632) -- at the resentencing hearing, the prosecution argued that the victims of these two offenses were the contributors. (Resentence Hearing, Tr 11/13/03, pp 11, 18-19). The Court agreed and accordingly, Petitioner's sentence was based upon 241 Friends PAC contributors and 412 Swing PAC contributors. The new guidelines produced a range of 10 to 23 months on the minimum and Judge Collette imposed a sentence of 23 to 120 months for the most serious offenses. (Id. 40).

On June 16, 2004, Judge College denied Mr. Dewald's motion for a new trial. At the motion, Mr. Dewald argued that the charges were preempted by federal law and that the restitution amount was miscalculated. Mr. Dewald also presented a supplement under Administrative Order 1981-7, Standard 11, at the motion. He asserted that the prosecution violated his First Amendment rights and that the common law fraud charges should be voided for unconstitutional vagueness.

11

**ARGUMENT I.**

**PETITIONER'S CONVICTIONS FOR FALSE PRETENSE, COMMON LAW FRAUD, AND LARCENY BY CONVERSION ALL STEM FROM ACTIVITY INVOLVING FEDERAL CAMPAIGN FINANCE. SINCE THIS FIELD IS COVERED BY A FEDERAL STATUTE, WHICH PREEMPTS STATE LAW, HIS CONVICTIONS MUST BE VACATED.**

All six of the instant charges concern Mr. Dewald's fundraising activities with the two PACs. The State of Michigan brought charges despite the fact that the Federal Elections Commission ("FEC"), the regulatory agency empowered by Congress to oversee federal campaign finance laws, had enforcement power over these activities and was actively investigating Mr. Dewald and the two PACs.

The Supremacy Clause serves as the basis for preemption doctrine. See, Cipollone v Liggett Group, Inc., 505 US 504, 516 (1992). There are three scenarios whereby federal law preempts state law. First, Congress expressly defines the preemption. Second, Congress shows an intent to occupy an entire field of regulation. Finally, state law is preempted because it conflicts with federal law. Michigan Canners & Freezers Assn, Inc, v Agricultural Marketing and Bargaining Board, 467 US 461, 469 (1984). All three of these scenarios implicate Mr. Dewald's charges.

**A. The Federal Election Campaign Act explicitly preempts the charges.**

12

The Federal Election Campaign Act ("FECA"), includes an express preemption provision. That provision states, "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 1 USC §453.

A fundamental tenet of our federal system of government is that the federal government has the exclusive authority to prosecute violations of its law. See Printz v United States, 521 US 898 (1997) (discussing the historical and constitutional importance of the division of power between state and federal governments). Indeed, the Constitution grants that authority to the Executive Branch of the federal government alone. Printz, 521 US at 922 ("The President, it says, 'shall take Care that the Laws be faithfully executed,' Art. II, §3, personally and through officers whom he appoints . . . Art. II, §2."). In this instance, primary authority to enforce the Federal Election Campaign Act is vested in the FEC, as to civil matters, and the United States Attorney General, as to criminal matters. 2 USC §437(g); 28 USC §516; see also Federal Election Commission v American International Demographic Services, 629 FSupp 317 (ED Va. 1986); United States v Tonry, 433 FSupp 620 (ED La 1977) (Department of Justice may enforce criminal penalties for violation of election laws).

**(1) Larceny by Conversion (commercial use of donor lists)**

Specific provisions of the Act directly cover the basis for

13

Mr. Dewald's prosecution on two counts of larceny by conversion. Federal law requires political parties to report to the Federal Election Commission ("FEC") every contribution they receive from individuals in excess of $200. This information then forms the content of the FEC's list. The $200 limitation, in turn, can serve to distinguish contributor lists which are rightfully and exclusively controlled by the political action committee[2] (which would list *all* contributions), from those which are rightfully and exclusively controlled by the FEC (which would list only donors who have contributed in excess of $200), which must be made public. 2 USC §438(a)(4). See Exhibit K, FEC Advisory Opinion ("AO") 1979-3.

Federal law expressly prohibits anyone from making commercial use of information contained in public FEC disclosures. 2 USC §438(a)(4) ("any information copied from such reports or statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes"). Likewise, FEC regulations prohibit the use of "any information copied, or otherwise obtained, from any report or statement, or copy, reproduction, or publication thereof, filed with the Commission" for the purpose of soliciting contributions. 11 CFR §104.15.

In counts five and six of the complaint against Mr. Dewald, the State of Michigan attempted to circumvent the Constitutional prescriptions on its authority. Although the State denominated

---

2   See People v Pohl, 202 Mich App 203, 205 (1993).

these charges as ones for larceny by conversion, there can be no doubt that the State was actually prosecuting Mr. Dewald for violating the federal election law, specifically 2 USC §438(a)(4). The prosecution's asserted theory was that Mr. Dewald obtained the list he used from the public reports issued by the FEC, and that he then violated the prohibition on commercial use of those lists by soliciting the same people. (Prosecution Opening, Tr 6/23/03, pp 81-82; Prosecution Closing, Tr 6/26/03, pp 545-547). The theory continues that these lists are the intellectual property of the committee which disclosed them. However, the FEC maintains complete control over its lists (once filed by and received from the PAC's), distinguishing between FEC's list, on the one hand, and a list compiled by the PAC, on the other hand, preventing even the PAC that originally disclosed the list to the FEC from using the FEC's list as if they were the PAC's own property. In FEC Advisory Opinion No. 1979-3, the FEC held as follows:

> The donor's authorization to [the Committee for the Survival of a Free Congress]("CSFC"), permitting use of information copied from reports filed under the Act for soliciting contributions, does not change the fact that information copied from filed reports is being used for an unlawful purpose. Thus the Commission concludes that alternative 4 is prohibited by 2 USC §438(a)(4). The distinction here between alternatives 1-3, and alternative 4 is the source of the contributor list.
>
> In Advisory Opinion 1977-66 the Commission concluded that a *political committee's use of its own contributor list* is not prohibited by 2 USC §438(a)(4) and Commission regulations at 11 CFR 104.13. The opinion reasoned that the names of the contributors were not obtained from the committee's reports to the Commission since the committee

15

itself prepared the report on the basis of its own
information.

Similarly in this case, §438(a)(4) would not prohibit the
donor from selling or renting its own contributor list
for use by CSFC to solicit contributions to CSFC, but it
does prohibit the use of *any list* to solicit
contributions which is copied or otherwise obtained from
disclosure reports filed under the Act.

Exhibit K, AO 1979-3, p 2 (emphasis supplied).

In this case, the prosecution's theory of unlawful conversion
failed to distinguish between lists controlled by the FEC (*not* the
property of the committees) from those controlled by the PACs which
may be subject to state law conversion charges on this basis.

The State of Michigan, however, has no authority to prosecute
Mr. Dewald for violating federal election law: that authority rests
exclusively with the federal government. US Const Art II, §3. His
convictions for larceny by conversion, counts five and six of the
complaint, must be reversed.

**(2) Common Law Fraud and False Pretenses**

Charges one through four, false pretenses and common law
fraud, rely on Mr. Dewald's alleged use of false pretense or
misleading language in his solicitation letters. MCL 750.218; MCL
750.280. In his closing argument, the assistant attorney general
reviewed the evidence for false pretense and gross fraud. He
listed the tickets to the inaugural ball, the names of the PACs,
the Pennsylvania Avenue, Washington, D.C. address, the use of Bush
and Gore's names in the letters, and the general misleading

16

language in the solicitations. (Prosecution Closing Argument, Tr 6/26/03, pp 536-541).

Each of these concerns is specifically addressed in FECA. The assistant attorney general himself said in his closing argument that the use of George Bush and Al Gore's name was "prohibited by FEC rules." (Id. 543-544). He stated that "FEC rules also prohibit a non-connected committee from using a candidate's name in the name of a special project." (Id. 544). Kenneth Jones, former counsel to the Republican National Committee named the federal statutes implicated by the use of George Bush's name and the inaugural ball event. (Jones, Tr 6/23/03, p 147). The letter sent by the Republican National Committee to Mr. Dewald also listed these provisions. (Exhibit G).

Specifically, FECA expressly prohibits non-connected PACs from using the name of a candidate in its Committee name. 2 USC §432(b)(4) ("In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name"). In a far more specific manner than the state charges, this provision governs the use of the phrase "Al Gore Inaugural Ball Gala Event," and "George W. Bush Inaugural Ball Gala Event." (Exhibits A and B). In these examples, the name of the candidate is being used in connection with *an event* (permissible under the FEC), not in connection with the name of a *committee* (impermissible under the FEC). Similarly,

17

FEC regulations state that "no unauthorized *committee* shall include the name of any candidate in *its name*." 11 CFR §102.14 (emphasis supplied).

Since the State of Michigan had no authority to prosecute Mr. Dewald for violation of federal law, his convictions for false pretenses and gross fraud, counts one through four of the complaint, must be reversed. See Galliano v US Postal Service, 836 F2d 1362 (1988) (finding that FECA preempts postal fraud statute where it is the "exclusive administrative arbiter of questions concerning the name identifications and disclaimers of organizations soliciting political contributions," but that postal fraud statute still applies to claims not specifically regulated by FECA, such as false statements); Compare Karl Rove & Co v Thornburgh, 39 F3d 1273 (1994) (finding no FECA preemption of state provisions regarding candidate financial liability where FECA does not address candidate personal liability and an FEC Advisory Opinion says state law controls liability for campaign debts).

## B. Congress intended FECA to occupy the entire field of federal campaign finance.

In addition to specifically preempting the charges against Mr. Dewald, FECA preempts his prosecution by broadly regulating PAC activity. "Various FECA provisions detail the structure of political committees, impose reporting requirements, empower and design the FEC, place limitations on the amounts of campaign

18

contributions and expenditures by individuals and corporations, and restrict the use of such funds." Teper v Miller, 82 F3d 989, 994 (1996).

In finding that a Georgia statute (prohibiting a leglislator from accepting campaign contributions while the legislature was in session) was preempted by FECA, the court in Teper noted that the "House Committee that drafted the current provision intended 'to make certain that the Federal law is construed to occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated.' H.R. Report No. 1239, 93d Cong, 2d Sess 19 (1974)." Teper, 82 F3d at 994. Likewise, according to the Conference Committee Report on the 1974 amendments to the Act, "[f]ederal law occupies the field with respect to criminal sanctions relating to limitations on campaign expenditures, the sources of campaign funds used in federal races, the conduct of federal campaigns, and similar offenses, but does not affect the states' rights" as to other election-related conduct, such as voter fraud and ballot theft. H.R. Report No. 93-1438, 93d Cong., 2d Session 69 (1974).

Indeed, 11 CFR §108.7 broadly defines FECA's preemption provision as follows:

(b) Federal law supersedes State law concerning the -
    (1) Organization and registration of political
        committees supporting Federal candidates;
    (2) Disclosure of receipts and expenditures regarding
        Federal candidates and political committees; and

19

(3) Limitation on contributions and expenditures
    regarding Federal candidates and
    political committees.

(c) The Act does not supersede State laws which provide for the

    (1) Manner of qualifying as a candidate or political
        party organization;
    (2) Dates and places of elections;
    (3) Voter registration;
    (4) Prohibition of false registration, voting fraud,
        theft of ballots, and similar offenses;
    (5) Candidates personal financial disclosure;
    (6) Application of State law to the funds used for the
        purchase or construction of a State or local party
        office building to the extent described in 11 CFR
        300.35.

Id. (Emphasis supplied).

    FECA controls the activities of federal candidate committees

and PACs.   In Mr. Dewald's case, it is the FECA enforcement

provisions which should control the alleged fraudulent claims and

conversion of property by his PACs.   See Bunning v Kentucky, 42 F3d

1008 (1994) (finding FECA precluded enforcement against federal PAC

of Kentucky law prohibiting exploratory activity).

    In addition to finding that the Act preempted State laws
    as to registration and reporting requirements, the
    Commission has determined that the Act preempts State and
    local laws as to the disclaimers that must appear on
    advertisements   or   solicitations,   treating   such
    disclaimers as related to the issues of disclosure and
    "the conduct of Federal campaigns," which were designated
    as subject to preemption in the legislative history
    described above.

See Exhibit L, FEC AO 1999-12.

    The prosecution speculated during the state court appeal that

Mr. Dewald's interpretation of FECA preemption "would prohibit

20

Ingham County from prosecuting an individual for vandalizing a Congressional candidates signs or headquarters." (Plaintiff-Appellee's Brief on Appeal, pp 23-24). However, such activities obviously are anticipated by section (c)(4) of 11 CFR §108.7, which specifically exempts from preemption "voting fraud, theft of ballots, and similar offenses." In contrast, FECA unambiguously preempts state civil and criminal actions involving the types of federal campaign finance issues involved in this case. 11 CFR § 108.7(b)(1) and (2).

## C. Conflicts between state and federal law necessitate preemption:

The final form of preemption is conflict between state and federal law. In Mr. Dewald's case, the prosecution offered the forwarding of contributions to Mr. Dewald from an address on Pennsylvania Avenue in Washington, D.C. as evidence of fraud and false pretenses. FECA does not prohibit using address drops outside of the principal place of business. If this practice is part of the evidence for state prosecution of fraud and false pretenses, then it directly conflicts with federal law. Similarly, FEC advisory opinions might allow PAC fundraising and solicitation activity that could in theory face state prosecution on fraud charges.

The conflict with federal law in this case is further demonstrated by two additional Administrative Opinions issued by the FEC. For example, in AO 1981-5 (Exhibit M, appended), the FEC

21

authorized Congressman Findley to use the list of his opponent's contributors, and in AO 1984-2 (Exhibit N, appended), the FEC gave Congressman Phil Gramm permission to use donor lists disclosed by an unrelated, "Unauthorized Committee". The FEC went further, suggesting that Gramm could tell the donors to request a refund. However, following these FEC rulings would have subjected Congressmen Findley and Gramm to prosecution under Michigan law. As such, Michigan law conflicts with federal law in this context and is therefore preempted for this reason.

The federal government has set up an elaborate set of rules to control and oversee the field of federal election activities. Congress has empowered an entire agency to regulate federal election activities. "The 1974 amendments to FECA created the FEC and 'vest[ed] in it primary and substantial responsibility for administering and enforcing the Act.' Buckley v Valeo, 424 US 1, 109 (1976)." Teper, 82 F3d at 995. The prosecution's argument -- which effectively would allow each and every state to be able to override the federal government and make determinations about what is legal and what is illegal in this arena -- would lead to nightmarish and absurd results if accepted by this Court.

**D.  FECA preempts state police powers to prosecute fraud:**

The prosecution argued during the state appeal that FECA does not preempt state police powers to prosecute fraud. Plaintiff-Appellee's Brief on Appeal, pp 20-24. However, none of the case

22

law relied upon by the prosecution contemplated a situation like Mr. Dewald's, where FECA preempts the criminal charges through both specific statute and general provisions regulating federal PACs. Indeed the cases relied upon by the prosecution serve to strengthen, rather than detract from, Mr. Dewald's preemption claim.

As in the situation of Mr. Dewald and FECA, federal statutes may explicitly preempt state civil or criminal claims explicitly through the statute's language, or implicitly through the structure and purpose of the statute. See Ryan v Brunswick Corp, 209 Mich App 519, 521-523 (1995) (finding Federal Boat Safety Act specifically precludes wrongful death action based on state boat equipment regulations). Conversely, in cases unlike Mr. Dewald's, where the language of the statute specifically does not preclude state or local laws, prosecution would be allowable. See Reeder v Kansas City Board of Police Commissioners, 733 F2d 543 (8th Cir 1984) (finding Missouri statute forbidding political contributions by police department employees not preempted because FECA primarily controls candidates not contributors and specific language in FECA legislative history allows state law regulation of state employees and local officers); Gustafson v City of Lake Angelus, 76 F3d 778 (6th Cir 1996) (no preemption of local seaplane prohibitions where FAA regulations specifically require compliance with local ordinances).

23

In <u>Friends of Phill Gramm</u> v <u>Americans for Phil Gramm in '84</u>, 587 FSupp 769 (ED VA 1984), the court held that the candidate was not entitled to a preliminary injunction against a rival PAC because FECA preempted actions involving the name of a candidate in a committee. This is the situation in Mr. Dewald's prosecution. The court observed that FECA did not categorically prohibit state law causes of action for fraud because it did not specifically address fraud in political advertising. <u>Friends of Phil Gramm</u>, 587 FSupp at 776. However, FECA does specifically address the bases for the instant state charges against Mr. Dewald, and as such it overrides state law in the area.

**E. State, rather than federal, prosecution of Petitioner's conduct produced draconian results in this case:**

The failure to dispose of this matter federally, as a matter of federal law, under FECA, and resorting instead to state law criminal fraud, false pretense and conversion charges, has produced draconian results in this case. Had Mr. Dewald's conduct been evaluated and processed, like other such cases, in an orderly fashion through the Federal Elections Commission framework, a number of safeguards would have been in place to protect his rights. First, federal law would have assured that any prosecution would have conformed with Mr. Dewald's First Amendment rights. See discussion <u>infra</u> at Argument II. Second, a variety of lesser interventions would have first been attempted with Mr. Dewald to deter any conduct which violated FECA. In other such cases, prior

24

to resorting to criminal remedies, the FEC brings a civil action, in federal court, to enjoin any elections-related conduct which it determines to be violative of FECA. See American International Demographic Services, supra. For example, in Demographic Services, the Court issued an injunction where the defendants were accused of taking donor lists, filed with the FEC, and distributing them to an entity for the purpose of renting them out to brokers and mailers, in violation of the FECA's ban on commercial use of donor lists under 2 USC §438 (a)(4).

In addition to an injunction, like that imposed in Demographic Services, had this case been processed in the ordinary fashion, Mr. Dewald could have received a civil penalty not to exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in the FECA violation. 2 USC §437g(a)(6)(C). Had this matter been processed in the ordinary fashion, Mr. Dewald might have availed himself of FECA's conciliation agreement procedures. 2 USC §§441j(b)and (c)(2). Worst case scenario, a successful criminal prosecution under FECA would have resulted in a sentence of imprisonment, which, at that time, could not have exceeded one year.[3] In contrast, in the

---

[3] The legislative history of FECA's criminal penalties was set forth in detail in United States v Hsia, 24 FSupp2d 33, 38-42 (D DC 1998). While the decision of the district court was ultimately reversed on appeal, United State v Hsia, 176 F3d 517 (DC Cir 1999), the district court correctly described FECA's then-extent one-year maximum sentence of imprisonment for violations like Petitioner's. See also 2 USC §437g (d)(1)(A), which was amended by 2002 Acts.Pub.L. 107-155, Title III, §312(b), 3/27/02, 116 Stat. 106,

instant case, Mr. Dewald was catapulted into a criminal prosecution under state law, he retained none of his First Amendment rights which Congress, by enacting FECA, sought to protect, and instead of a civil fine, he received a sentence of from 23 months to 120 months in prison, and court-ordered restitution in excess of $700,000.

Ultimately, nearly three years after Dewald's state court criminal trial, in May of 2006, through its General Counsel, the Federal Election Commission issued a report. Citing the outcome in the state criminal case, the FEC admonished Mr. Dewald for some of his conduct, and took no further action. See Exhibit O, appended, General Counsel's Report #3 Before the Federal Election Commission. The FEC never initiated a civil action in federal court, nor have they referred this matter to the U.S. Attorney General for criminal prosecution. Significantly, the FEC found that as to the conduct underlying the state law conversion charges, Dewald in all likelihood obtained the donor lists from a source other than the FEC disclosure reports, and that in all likelihood, the donor list Dewald obtained over the Internet did not contain the notice of limitations on use of disclosure. These findings were consistent with Dewald's trial defense to the unlawful conversion counts. Petitioner maintains that the procedural

which made the enhanced penalties applicable to "violations occurring on or after" November 6, 2002. Petitioner's alleged violations all preceded the effective date of this amendment.

26

mechanisms chosen, the findings themselves, and the chosen remedy
(an admonishment) by the FEC all underscores, in contrast, the
draconian nature of the state court proceedings in this case.[4]

Justice (then-judge) Ruth Bader Ginsberg addressed the
analogous scenario of the Postal Service's prosecution for fraud
notwithstanding the provisions of FECA.

> FECA's first-amendment-sensitive regime includes a
> procedural as well as a substantive component. When a
> candidate or political organization is alleged to have
> violated the name or disclaimer provisions of FECA, the
> allegations will be assessed according to FECA
> procedures. Those procedures require that informal
> conciliation efforts between an alleged FECA violator and
> the FEC occur before any formal civil enforcement action
> is taken. 2 USC §§ 437g(a)(4) (1982). If conciliation
> fails, the FEC may not itself impose sanctions; it must
> institute a civil action in a federal district court in
> order to obtain relief. 2 USC §§ 437g(a)(6) (1982). Thus,
> even if the Postal Service were to apply the substantive
> standards of FECA in determining whether the name or
> disclaimers of an organization soliciting political
> contributions constituted a false representation for
> purposes of section 3005 , there would be a gap. The
> Postal Service's procedures, which include neither
> conciliation nor judicial imposition of sanctions, would
> not measure up to the first-amendment-prompted
> arrangements Congress devised for FECA enforcement
> actions.
>
> .... Were the Postal Service to find the representations
> false under section 3005 based on its own assessment of
> the public's perception, the Service's adjudication --
> both substantively and procedurally -- would effectively
> countermand the "precisely drawn, detailed" prescriptions
> of FECA.

---

4    Also by comparison, in its investigation of Dewald and the
two PACs, the FEC Counsel General found reason to believe that
TRKC, Inc, which operated tray.com, violated 2 USC §438(a)(4) as
well, and decided to admonish them and take no further action.
Exhibit O, appended.

27

<u>Galliano</u>, 836 F2d at 1370-1371.

In Mr. Dewald's case, the State of Michigan brought an untenable prosecution preempted by federal law. His convictions must be vacated.

### F. The instant challenge is cognizable as a federal habeas claim under 28 USC §2254:

A federal court may grant habeas relief based upon a state trial court's erroneous ruling on a federal preemption issue where the issue was developed and decided in the state trial court. See e.g. <u>Tart</u> v <u>Commonwealth</u> <u>of</u> <u>Massachusetts</u>, 949 F2d 490 (1st Cir 1991). In the instant context, federal relief is warranted and authorized under 28 USC §2254 (d)(1) because Petitioner fairly presented this claim to the state courts for decision, and, in rejecting this claim, the state courts' decision amounted to an unreasonable application of United States Supreme Court precedents listed and discussed above. See e.g., <u>Cipollone</u>, 505 US at 516; <u>Michigan</u> <u>Canners</u> <u>and</u> <u>Freezers</u> <u>Association</u>, 467 US at 469. See also <u>People</u> v <u>Dewald</u>, 267 Mich App 365, 375 (2005), citing <u>Wayne</u> <u>County</u> <u>Board</u> <u>of</u> <u>Commissioners</u> v <u>Wayne</u> <u>County</u> <u>Airport</u> <u>Authority</u>, 253 Mich App 144, 197-198 (2002), which in turn relied upon United States Supreme Court precedent in <u>English</u> v <u>General</u> <u>Electric</u> <u>Co.</u>, 496 US 72, 78-79 (1990), on the issue of federal preemption.

**ARGUMENT II.**

**THE DEFENDANT'S CONVICTIONS OF FALSE PRETENSES AND COMMON LAW FRAUD MUST BE VACATED BECAUSE THE CONTEXT-BASED STANDARD USED TO CONVICT THE DEFENDANT FOR MISREPRESENTING HIS AFFILIATION INFRINGES UPON HIS FIRST AMENDMENT RIGHTS TO FREEDOM OF ASSOCIATION AND TO POLITICAL ADVOCACY.**

Mr. Dewald maintains that the instant prosecution infringed upon a variety of rights protected by the First Amendment to the United States Constitution. The First Amendment protects an individual's rights to freedom of speech, freedom of association and the right to advocate freely on behalf of political candidates. Conversely, the First Amendment prohibits compelled speech, it prohibits compelled disclosures of association, and it prohibits compelled disclosures of party affiliation. See also McIntyre v Ohio Elections Commission, 514 US 334 (1995)(First Amendment prohibits statute which forbids the distribution of anonymous campaign literature). In this context, Mr. Dewald had the right to the "associate" with the political candidate of his choice. He had the corollary right to decline to disclose that association. State law offenses of fraud and false pretenses, construed in a manner which infringes upon the foregoing protections, are unconstitutionally overbroad.

The defendant was convicted in this case of the offenses of obtaining money by false pretenses, based upon his alleged conduct of making a "representation that he was affiliated" with the Bush

29

and Gore campaigns, and of gross fraud, based upon his alleged conduct of using "misleading language in solicitation letters which impl[ied] affiliation" with the Gore and Bush campaigns.

The defendant maintains that for purposes of the constitutional analysis, there is no meaningful distinction between the terms "association" and "affiliation". In state court, the prosecution did not even attempt to define these terms. Any statement advocating for or supporting a candidate implies both association and affiliation with that candidate. Criminalizing political advocacy, depending upon whether or not a candidate "authorizes" the advocacy violates the First Amendment by placing an intolerable burden on the right to advocate. Fundamental First Amendment rights cannot be deemed so fragile as to evaporate at the whim of a political candidate.

In this case, the prosecution did not allege that Mr. Dewald actually made *any* explicitly false statements. He was convicted on these counts not for what he said but for what he failed to say.[5] The prosecution's theory in this case was that Mr. Dewald committed the crimes of obtaining money by false pretenses and common law fraud because he failed affirmatively to notify potential contributors that the candidates had not approved an affiliation or association with him. This approach has been rejected as compelled

---

[5] The prosecution relied on the case of People v Jory, 443 Mich 403, 412 (1993), to support its contention that a false pretense can be based upon the failure to speak when it is necessary to do so.

30

speech in <u>Riley</u> v <u>National Federation of the Blind of North Carolina, Inc</u>, 487 US 781 (1988), and in <u>Illinois ex rel Madigan</u> v <u>Telemarketing Associates</u>, 538 US 600 (2003), both charitable contribution cases.

The First Amendment protects political association as well as political expression.   <u>NAACP</u> v <u>Patterson</u>, 357 US 449, 459 (1958).

> ... [T]he First and Fourteenth Amendments guarantee "'freedom to associate with others for the common advancement of political belief and ideas,'" a freedom that encompasses "`[t]he right to associate with the political party of one's choice.'"   <u>Kusper</u> v <u>Pontikes</u>, 414 US 56, 57 (1973), quoted in <u>Cousins</u> v <u>Wigoda</u>, 419 US 477, 487 (1975).

<u>Buckley</u> v <u>Valeo</u>, 424 US 1, 15 (1976)(content-based regulation of political speech is subject to strict scrutiny standard).

Political fundraising is inseparable from political speech. "Solicitation is a recognized form of speech protected by the First Amendment."   <u>United States</u> v <u>Kokinda</u>, 497 US 720, 725 (1990). <u>Austin</u> v <u>Michigan Chamber of Commerce</u>, 494 US 652, 656 (1990)(use of funds to support a political candidate is "speech" protected by the First Amendment).

The Supreme Court has consistently held that the First Amendment constitutional protections of speech and association are broad. The State may not infringe upon free speech and association either by enacting unconstitutional statutes that infringe upon these protected rights, or by construing otherwise constitutional statutes in a way that infringes upon these protected rights. The

31

latter scenario is at issue in this case.

> The First Amendment affords the broadest protection to political expression in order "to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people". Roth v United States, 354 US 476, 484 (1957) .... "There is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs ...[including] discussions of candidates ..." Mills v Alabama, 384 US 214, 218 (1966).

> .... "[I]t can hardly be doubted that the constitutional guarantee [of the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." Monitor Patriot Co. v Roy, 401 US 265, 272 (1971).

Buckley, 424 US at 14-15.

Petitioner's conviction of the state law crimes of false pretenses and common law fraud violate constitutional protections afforded Petitioner and the PACs, as well as their contributors and benefactors, because they are vague as to the standards being applied and overly broad as to conduct proscribed, thereby intruding upon the protected rights of speech, association, and political advocacy. In a fraud action implicating free speech, the government shoulders the burden "of proving that the speech it seeks to prohibit is unprotected" under the First Amendment. Illinois ex rel Madigan v Telemarketing Associates, 538 US 600, 620 (2003). The prosecution failed to sustain this burden in Mr. Dewald's case.

In Vanasco v Schwartz, 506 F2d 524 (2d Cir 1974), on remand, 401 FSupp 87 (SD NY 1975), aff'd, 423 US 104 (1976), the court

32

confronted the question of misleading language relating to affiliation in political speech. On remand, the district court in Vanasco noted that while a "deliberate calculated falsehood does not enjoy constitutional protection," sections of a New York elections law prohibiting "misrepresentation of any candidate's party affiliation ... cast a substantial chill on the expression of protected speech and are unconstitutionally overbroad and vague on their face." Vanasco, 401 FSupp at 94-95. In Vanasco, a political candidate was misrepresented by his political opponent when he was cast in campaign literature as a "Republican Liberal". Contrast Treasurer Committee to Elect Gerald D. Lostracco v Fox, 150 Mich App 617, 623 (1986)("once the circuit court judge determined the defendant's advertisements were misleading in fact, any republication would have been knowing misrepresentation.")

In the instant case, prosecution argues that the defendant can be convicted of these crimes because contributors were misled not by actual false statements, but by a "contextual misrepresentation": to wit, a statement that is not affirmatively false, but which may appear false when the entire context (a "totality of circumstances") surrounding the statement is examined. In the instant case, such a construction of these common law and statutory offenses is overly broad and impermissibly infringes the defendant's First Amendment right of speech, association and political advocacy. The problem with construing these offenses in

33

this manner is that an allegation of "misrepresentation could be applied to almost all campaign speech." Vanasco, 401 FSupp at 97. Indeed, many facts cited by the prosecution, allegedly probative of misrepresentation -- such as use of the candidate's name -- are mere indicia of association, a necessary component of legitimate advocacy for a political candidate. Moreover, *affiliation"* in the context of campaign speech is a term of art. Delegating to a jury the responsibility to make the subjective distinction between *"association"* and *"affiliation"*, particularly without the guidance of a jury instruction, implicates the chilling of free speech forbidden by the First Amendment. "Because the First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v Button, 371 US 415, 434 (1963). Michigan's false pretense and common law fraud offenses fail to meet the "narrow specificity" requirement of Button.

Black's Law Dictionary (7th ed.) defines affiliation, from the root affiliate: "a corporation that is related to another corporation by shareholding or other means of control." Webster's Third International Dictionary defines affiliate much more broadly, including "to connect or associate oneself." Black's offers no definition for the verb associate. Webster's definition of associate is lengthy and broad. First of five definitions for the verb is "to join often in a loose relationship as a partner, fellow

34

worker, colleague, friend, companion, or ally." The United States
Supreme Court has defined notion of affiliation broadly. In
Buckley, 424 US at 22, the Court noted that "[m]aking a
contribution, like joining a political party, serves to affiliate
a person with a candidate." An individual has a First Amendment
right to associate with the political party of his or her choosing.
Rutan v Republican Party of Illinois, 497 US 62 (1990). This right
to freedom of association also includes "the freedom to retain any
neutrality or ambiguity". Ogden v Marendt, 264 FSupp2d 785, 790 (SD
Ind 2003).[6] Contrast California Democratic Party v Jones, 530 US
567 (2000)(political party's right to run a "closed" primary
overrides an individual voter's right to "associate" with either
party by voting in closed primary). The meaning of the words
"affiliate" and "associate", in common usage, are so close and
ambiguously interrelated that relegating such a distinction to the
context of the message alone is impermissibly vague. Statutes must

6    In Ogden, where a state law regarding the "slating" of
political candidates was struck down on First Amendment grounds,
the Court held as follows:

> The anti-slating law also places a heavy burden on the
> individual candidates themselves by forcing them to
> choose between *either* consenting publicly to a request
> for inclusion on a slate, thereby placing their
> imprimatur on that expression, *or* suppressing that speech
> entirely by withholding written consent. This scheme
> thus deprives a candidate of the freedom to retain any
> neutrality or ambiguity with respect to his would-be
> supporters.

Ogden, 264 FSupp2d at 790 (emphasis in original).

35

be clear as to what is illegal so that persons will not be chilled in the exercise of their fundamental First Amendment rights for fear they will be prosecuted. Meese v Keene, 481 US 465, 473 (1987).

In a series of cases, the Supreme Court has grappled with context-based standards in determining the permissible limitations on political speech. Buckley, supra; McConnell v Federal Elections Commission, 540 US 93 (2003); Thomas v Collins, 323 US 516 (1945). In an analogous context, in Thomas, the Court held as follows when interpreting the term "invitation" in the context of a challenge based upon First Amendment freedom of speech.

> [W]hether words intended and designed to fall short of invitation would miss the mark is a question of both intent and effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
>
> Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

Thomas, 323 US at 535.

Implicit or context-based standards are so broadly tailored that they generally run afoul of the First Amendment. A "strict scrutiny" standard applies to statutes which regulate political speech. Consequently, in this context, only a standard of

36

affirmative misrepresentation, one that is "easily understood and objectively determinable", such as "express terms" or "explicit words", is sufficiently, narrowly tailored to survive the heightened strict scrutiny standard.    McConnell, supra. Similarly, in Buckley, 424 US at 43, citing Thomas, the Supreme Court held that the FEC may not apply a context-based standard to "express advocacy" and instead suggested a list of words and phrases, applying these to written as well as spoken messages. In Buckley, the Court explained its concerns about vagueness, opting for a standard involving "express terms" and "explicit words", and rejecting a standard which focuses on context.  Buckley, 424 US at 42-47.   Since Buckley, federal circuit courts of appeal have consistently applied this standard.   See e.g., Chamber of Commerce v Moore, 288 F3d 187, 192 (5th Cir 2002); Citizens for Responsible Government State PAC v Davidson, 236 F3d 1174, 1187 (10th Cir 2002); Vermont Right to Life v Sorrel, 221 F3d 376, 386-387 (2d Cir 2000); Iowa Right to Life v Williams, 187 F3d 963, 969-970 (8th Cir 1999); Faucer v FEC, 928 F2d 468, 471 (1st Cir 1991).

> For example, in Virginia Society for Human Life, Inc. v
> Federal Elections Commission, 263 F3d 379, 392 (4th Cir.
> 2001), the Fourth Circuit found a federal regulation
> unconstitutionally overbroad because it defined express
> advocacy as a communication that, when taken as a whole,
> "could only be interpreted by a reasonable person as
> containing advocacy of the election or defeat of one or
> more clearly defined candidate(s)." The court held that
> "[t]he regulation goes too far because it shifts the
> determination of what is express advocacy away from the
> words 'in and of themselves' to 'the unpredictability of
> audience interpretation.'" The Eighth Circuit reached a

37

> similar conclusion when it found that an election
> regulation defining express advocacy according to "what
> reasonable people or reasonable minds would understand by
> the communication" was unconstitutional because the
> regulation "does not require express words of advocacy."
> Iowa Right to Life, 187 F3d at 969.

Chamber of Commerce of US v Moore, 288 F3d 187, 194 (5th Cir 2002),

In McConnell, the Supreme Court settled on a four-pronged definition of "election communication" because "these components are both easily understood and objectively determinable." Id. 193-194. Under the McConnell standard, the instant statute, as applied here, would be unconstitutionally vague and overbroad because an implicit misrepresentation of association or affiliation is neither easily understood nor objectively determinable.

In this case, the prosecution made no argument that the solicitation letters contained express words, phrases or affirmative assertions of affiliation with the candidates. Instead a very broad argument was raised, that these were misrepresentations when one considers the "totality of circumstances." (Prosecutor's Closing Argument, Tr 6/26/03, pp 536-537). Although this standard may be acceptable in purely commercial speech, it is impermissibly broad when applied to political speech. Because political speech serves "the bringing about of political and social changes desired by the people," [Roth v United States, 354 US at 484], it protects not only the speaker's interest but also the public's interest in hearing the speaker's message. "[T]he First Amendment is concerned not only with the

38

speaker's interest in speaking, but also with the public's interest in receiving information." Banks v Wolfe County Board of Education, 330 F3d 888, 896 (6th Cir 2003), quoting from Chappel v Montgomery County Fire Protection District No. 1, 131 F3d 564, 574 (6th Cir 1997).

Fully cognizant of First Amendment concerns, Congress enacted the Federal Elections Campaign Act (FECA), and with it a sweeping set of regulations designed to prevent fraud and corruption in federal elections, precisely the issues of concern to state prosecutors in the instant case. In the course of enacting the FECA, Congress addressed the field of political solicitations "with First Amendment concerns in plain view." Galliano v US Postal Service, 836 F2d 1362, 1368 (DC Cir 1988)(Bader Ginsberg, J.). Among other things, the FECA regulates representations of affiliation in advocacy and solicitations by requiring certain disclosures in solicitations and penalizes violations with both civil and criminal punishment. Its measures are narrowly tailored and have been constitutionally tested. The questions of First Amendment constitutionality, argued here, and federal preemption (Argument I, supra), are two sides of the same coin.

State interests in preventing fraud frequently run afoul of First Amendment concerns when applied overly broadly. See Talley v California, 362 US 60 (1960), and Watchtower Bible and Tract Society of New York v Village of Stratton, 536 US 150 (2002).

39

While the State of Michigan has a legitimate interest in preventing the types of misrepresentations alleged in this case, the FECA disclosure requirements regarding authorization are adequate to address this problem. Moreover, in contrast to Michigan's false pretenses and common law fraud offenses, FECA regulations are also narrowly tailored to meet First Amendment concerns.

In Galliano, now-Justice (then-judge) Ruth Bader Ginsberg, writing for a DC Circuit, found that the Federal Elections Commission is the "exclusive administrative arbiter of questions concerning the name identifications and disclaimers of organizations soliciting political contributions". Id. 1370. Judge Ginsberg found that some aspects of that action, brought under the postal fraud statute, were not preempted by FECA because the conduct at issue, and the violations alleged, were not specifically regulated by FECA. Id. However, Mr. Dewald's case is distinguishable from this part of the Galliano holding because all of Mr. Dewald's alleged actions, and inactions, are specifically regulated by the FECA, and as such, his conduct may not be prosecuted under state law false pretenses or fraud crimes.

The Supreme Court addressed the analogous scenario of misleading charitable solicitations in Madigan v Telemarketing Associates, 538 US 600 (2003). In Madigan, the Court permitted an Illinois state fraud action where the defendant-telemarketers used affirmative statements that misled donors about how their donations

40

would be spent. The lawsuit in Madigan concerned Illinois "common-law and statutory claims for fraud and breach of fiduciary duty." Madigan, 538 US at 607. The Illinois common law and consumer fraud offenses both require a "false statement" as to a material fact. Connick v Suzuki Motor Co., 174 Ill 2d 482 (1996); Maloney v Alice, 251 Ill 3d 51 (1993). As such, the Madigan case is distinguishable from the instant scenario. Madigan involved an affirmative misstatement by the defendant. In contrast, Mr. Dewald was prosecuted for a statement he failed to make. In contrast to the Illinois provisions at issue in Madigan, Michigan's false pretenses statute is overbroad, as is its common law fraud application in this case. It is not limited by any requirement of either a false statement or a material fact. In Michigan, a false pretense, or a fraud at common law, may include the failure to make a statement, and as such, prosecution under these offenses infringe upon protected rights.

The Riley and Madigan decisions together hold that while a state may bring a fraud action based upon an affirmative misrepresentation, they may not ground such an action upon a mere passive "failure to convey". In Madigan, the complaint

> asserted that Telemarketers *affirmatively represented* that "a significant amount of each dollar donated would be paid over to Viet[N]ow" to be used for specific charitable purposes -- rehabilitation services, job training, food baskets, and assistance for rent and bills ... -- while in reality, Telemarketers knew that "15 cents or less of each dollar" was "available to Viet[N]ow for its purposes."

41

Madigan, 538 US at 619 (emphasis supplied). The defendant maintains that the Riley and Madigan holdings do not permit the contextual standard utilized by the prosecution in this case. In Madigan, the Court distinguished that situation from the one presented in Riley v National Federation of the Blind, 487 US 781 (1988), as follows:

Had the State Attorney General's complaint charged fraud based solely on the percentage of donations the fundraisers would retain, *or [on] their failure to alert donors to fee arrangements at the start of each call,* Riley would support swift dismissal.

Madigan, 538 US at 617 (emphasis supplied). In Madigan, the fraud action was upheld because it was not based simply upon "... what Telemarketers failed to convey". Rather, it was based upon affirmative misrepresentations that Telemarketers knew to be false. Madigan, 538 US at 618.

In the instant case, the prosecution alleged misrepresentation based upon what Mr. Dewald failed to convey. The prosecution did not allege that Mr. Dewald affirmatively and expressly represented an affiliation he knew to be false, but rather that the disclaimers as to affiliation included in the solicitation letter as required by the FEC and those in the FEC registration, and publicly available at the FEC web site, were inadequate to convey his true affiliation, and further that to be properly shielded from a state law fraud action such as this, Dewald affirmatively had to disclose more. The prosecution seeks to criminalize the failure of a

42

commercial or volunteer fundraiser to disclose that he is not affiliated with the cause for which he is fundraising.  However, the Court in Riley forbid such a required disclosure as compelled speech.[7]  A political fundraiser cannot be compelled to say something to cure an implicit misrepresentation without "substantially burdening protected speech".  Riley, 487 US at 799. The only compulsory disclaimers along these lines found constitutional are the disclaimers required by the FEC and upheld as constitutional in Buckley, supra.

Petitioner's solicitations contain no deliberate falsehoods, or indeed, any falsehoods at all.  The prosecution does not argue that falsehoods were used outside the context of these letters to create a misrepresentation either.  Mr. Dewald made no attempt to conceal his identity, the identity of the organizations involved, or the true nature of their affiliations.  Petitioner maintains that in all material respects, he complied with applicable local,

---

[7]   The Court held as follows in Riley:

> Thus, we would not immunize a law requiring a speaker
> favoring a particular government project to state at the
> outset of every address the average cost overruns in similar
> projects, or a law requiring a speaker favoring an incumbent
> candidate to state during every solicitation that
> candidate's recent travel budget.  Although the foregoing
> factual information might be relevant to the listener, and,
> in the latter case, could encourage or discourage the
> listener from making a political donation, a law compelling
> its disclosure would clearly and substantially burden the
> protected speech.

Riley, 487 US at 799.

43

state and federal regulations, including those of the FECA.

Political speech, even if misleading, is protected unless is based on an express, deliberate, and calculated falsehood (Madigan) or unless it has already been judicially determined to be misleading and is specifically enjoined (Lostracco). Implicit representations of affiliation are insufficiently distinguishable from the protected right of association. Context-based standards in political speech do not allow sufficient First Amendment breathing space. The State's interest in preventing fraudulent representations of affiliation is adequately met by provisions of the FECA. A failure to disclose a political advocate's affiliation may not be made criminal unless the proscription is narrowly tailored and constitutionally protected as is the case with the FECA. A fraud action involving political solicitations may only be based on what is affirmatively represented and known or adjudicated to be false. The state law offenses of obtaining money by false pretenses and common law fraud are unconstitutional as applied in this case, and are otherwise preempted by federal law. The defendant's convictions as to these offenses must be set aside.

Finally, the instant challenge is clearly cognizable under 28 USC §2254(d)(1). A federal court may entertain a properly preserved habeas claim based a Petitioner's contention that a state trial court's erroneous ruling implicated the defendant's rights under the First Amendment. Watts v Quarterman, 448 FSupp2d 786 (WD

44

Tex 2006). In the instant context, federal relief is warranted and authorized under 28 USC §2254 (d)(1) because Petitioner fairly presented this claim to the state courts for decision, and, in rejecting this claim, the state courts' decision amounted to an unreasonable application of United States Supreme Court precedents listed and discussed above. See, Riley, Madigan, supra. See also People v Dewald, 267 Mich App at 382, discussing Madigan.

**ARGUMENT III.**

**THERE WAS INSUFFICIENT EVIDENCE TO CONVICT PETITIONER OF FALSE PRETENSES, COMMON LAW FRAUD, OR LARCENY BY CONVERSION, AND AS SUCH, THESE CONVICTIONS ARE IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW.**

In determining a federal habeas challenge based upon the sufficiency of the evidence, "[t]he relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v Virginia, 443 US 307, 319 (1979). Petitioner maintains that in this case, the state courts' decision on the sufficiency of the evidence claim was an unreasonable application of the Supreme Court's decision in Jackson. 28 USC §2254(d)(1).

**A. False Pretenses and Common Law Fraud**

**(1) There was insufficient evidence to convict Mr. Dewald of false pretenses and common law fraud.**

45

The defendant was convicted on two counts each of false pretenses and common law fraud[8]. The first count of false pretenses[9] involved the felony charge as to the Democratic Party for the contributions of Kathleen Westover and Bruce Miller over a total of $1,000. (Verdict, Tr 6/27/03, p 632). Count two involved the misdemeanor charge in relation to the Republican party for Mr. Tringali's contribution of less than $200.[10]  (Id. 632).  The charging documents, jury instructions and court's opening statement to the jury all stated that the individual contributors were the

[8]   MCL 750.280. Gross frauds and cheats at common law:
      Sec 280. Any person who shall be convicted of any gross fraud or cheat at common law, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 10 years or by a fine of not more than 5,000 dollars.

[9]   At the time of Mr. Dewald's conviction, MCL 750.218, use of false pretenses with intent to defraud, provided in part:

      Sec 218 (1) A person who, with intent to defraud or cheat and by color of a false token or writing, by a bogus check or other written, printed, or engraved instrument, by counterfeit coin or metal that is intended to simulate a coin, or by any other false pretense does 1 or more of the following is guilty of a crime punishable as provided in this section:

      (a) Causes a person to grant, convey, assign, demise, lease, or mortgage land or an interest in land.
      (b) Obtains a person's signature on a forged written instrument.
      (c) Obtains from a person any money or personal property or the use of any instrument, facility article, or other valuable things or service ...

[10]   Tringali's name appears in an FEC disclosure report for an earlier contribution over $200.

46

alleged victims of Mr. Dewald's false pretenses. (Court, Tr 6/23/03, pp 70-71; Tr 6/27/03, pp 617-618, 632). Counts three and four, the common law fraud charges, involved alleged fraud on the Gore and Bush campaigns respectively.[11]  (Id. 619-622, 632).

The elements for conviction of false pretenses are: (1) use of false pretense, representation, or statement as to existing fact; (2) defendant's knowledge of the falsity of the representation; (3) defendant's intent to defraud or cheat; (4) another person's detrimental reliance on the pretense; (5) reliance resulting in loss of something of value.[12]  (Jury Instructions, Tr 6/27/03, pp 615-619).  See People v Flaherty, 165 Mich App 113, 119 (1988); People v Peach, 174 Mich App 419, 422 (1989).

Although the stated victims (as specified in the court's jury instructions) were the political campaigns rather than the individual contributors, the elements for common law fraud are identical. Gillespie, Michigan Criminal Law and Procedure, §86.15, Gross Fraud ("The words 'cheat and defraud' do not import any known common law offense. If punishable at all as a crime, it is only when the cheat is accomplished by false tokens or false pretenses").  See Belle Isle Grill Corp v City of Detroit, 256 Mich App 463, 477 (2003).  Accordingly, in the common law fraud jury

---

11   The victims as to these counts were never identified until the jury was instructed.

12   The amount of value determines whether the charge is to be graded as a misdemeanor or felony.

instructions, the trial court focused on misleading language, but listed the identical five elements to the charge of false pretenses. (Court, Tr 6/27/03, pp 619-621).

Absent a natural distaste for Mr. Dewald's decision to simultaneously fundraise for both political parties, no rational trier of fact should have found Mr. Dewald guilty of the actual charges of false pretenses and common law fraud. There is simply no evidence for his use of false statements or misrepresentation, his knowledge of any falsity, his intention to defraud, or a loss by the victim.

As the basis for the false pretenses and fraud charges, the prosecution argued that the working of the solicitation letters was intended to mislead potential donors into believing that the PACs were officially affiliated with the Democratic and Republication parties. In his closing argument, the prosecution reviewed the evidence for false pretense and fraud. He listed the tickets to the inaugural ball, the deceiving names of the PACs, and Pennsylvania Avenue, Washington, D.C. addresses, the use of Bush and Gore's names in the letters, and the general misleading language in the solicitation. (Prosecution Closing Argument, Tr 6/26/03, p 536-541).

None of these claims were false representations. Friends PAC did give money exclusively to Democratic causes and Swing States did give money exclusively to Republican ones. (Hensler, Tr

48

6/23/03, pp 200-201; Motley, Tr 6/23/03, pp 226-227; Motley, Tr 6/24/03, pp 249, 284). The PACs donated a substantial portion of the money they received, and might have donated more, had the government not seized over $172,000 of their funds within 2 weeks of their receipt. (Id. 254). Had this money been donated, the total contributions would have been in excess of 40% of total receipts. PACs in general have high overhead costs, and a 20-40% rate of actual contribution after expenses such as salaries, consulting services, printing costs, and postage is not only plausible, it is quite commonplace, even exceptional.[13] The PACs were properly registered with the FEC and their names only indicated the parties whose candidates they advocated and to which they contributed money. (Jones, Tr 6/23/03, p 176; Motley, Tr 6/24/03, p 247).

Kenneth Jones, a Republican Party lawyer acknowledged that it was permissible to buy tickets to the inaugural ball and then give them away. (Jones, Tr 6/23/03, pp 166-169). Indeed, defense counsel's use of an inaugural ball ticket as an exhibit indicated that Mr. Dewald acquired at least one ticket. (Id. 168). The prosecution produced no evidence that Swing States PAC failed to raffle inaugural ball tickets to Swing States contributors.

---

[13] See, eg, OpenSecrets.org, Top 20 PACs by Total Expenditures, available at http://www.opensecrets.org/pacs/topacs.asp?txt=A &Cycle=2002.

49

A line-by-line analysis of the initial solicitation letters reveals no actual false statements or misrepresentations. Friends and Swing States tried to raise money from Democratic and Republican contributors respectively "to capture the electoral votes in these critical swing states." (Exhibits A and B). Friends contributed $36,000 to Democratic institutions, including the party committees in Michigan, Missouri, Florida, and Tennessee, four closely contested "swing" states mentioned in the letter. (Exhibit F). Similarly, Swing States contributed $71,000 to Republican organizations, including the political party committees in ten closely contested "swing" states mentioned in the letter.[14] (Exhibit E). Each PAC contributed the same proportion of the funds it raised as its counterpart and neither suffered a disadvantage in relation to the other.

The letters also correctly outlined contribution dollar limits and the fact that a spouse could also contribute. As noted above, the prosecution presented no evidence that Mr. Dewald failed to raffle the inaugural ball tickets to the Swing States contributors. The only other statements in the letters concern typical Democratic

---

14   The Supreme Court, in Buckley v Valeo, 96 SCt at 612,636, noted that "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate." These PACs, by the measure of Buckley, actually were, in fact, affiliated with their respective official candidate committees.

lingo about Social Security and Medicare in the Friends solicitations, and typical Republican lingo about taxes and spending in the Swing States solicitation. (Exhibit A and B).

Similarly, a line-by-line analysis of the post-election day, recount letters reveals no false statements or misrepresentations. Al Gore and George Bush did each claim electoral victory and there were costly legal challenges in multiple states. The letters repeat these facts, with Swing States claiming a Bush victory that needed protection, and Friends claiming a Gore victory needed protection. (Exhibit E). Again, the letters accurately stated campaign finance law with regard to contribution limits and spousal contributions. The letters then offered coffee mugs to certain contributors. (Exhibits A, B, C, and D). The prosecution never provided any evidence that the PACs failed to follow through on the mug giveaway.

None of the four letters purported to specifically represent the Democratic or Republican Party. None of the four letters claimed to specifically come from the Bush or Gore campaigns. The Swing States' letters referred to the "Swing States PAC" and the "Swing States for a GOP White House PAC"[15] (emphasis added). The Friends' letters referred to the "Friends for a Democratic White House PAC." (emphasis added). (Id.)

---

15    In later letters, this committee was named "Swing States for a Conservative White House".

51

Consequently, the testimony and exhibits at trial and the text of the letters provide insufficient evidence of either false statements or misrepresentations, the first element of both the false pretense and common law fraud charges.

The second and third elements for the false pretense and fraud charges involve Mr. Dewald's knowledge of the alleged misrepresentations and his intent to defraud. Assuming arguendo, that the PACs did in fact make false representations, there is no evidence of fraudulent knowledge or intent.

When Mr. Dewald received a cease-and-desist letter from the Republican Party about his use of the "GOP" trademark and an "Inaugural Ball Gala Event," he removed the offending language from his subsequent solicitations. (Jones, Tr 6/24/03, pp 143-144; Exhibit G). He did not appear initially to know that the phrases created a problem. The prosecution also pointed to the transfer of $150,000 from Mr. Dewald's account to a bank in Cypress. (Motley, Tr 6/24/03, p 236). However, there was nothing illegal about this transaction and Mr. Dewald readily cooperated with Agent Donovan and provided an explanation for this PAC-related financial transfer. (Id. 260). Finally, the prosecution pointed to the $5,000 payment to Mr. Dewald's ex-wife under the auspices of "American Political Lists," as evidence of intent to defraud. (Motley, Tr 6/23/03, pp 214,221; Motley, Tr 6/24/03, p 272, Prosecutor's Closing Argument, Tr 6/26/03, p 555). Once again,

however, there was nothing illegal about this transaction, and Mr. Dewald filed a timely amendment with the FEC which made clear that the "American Political Lists" contribution was in care of his ex-wife. (Motley, Tr 6/23/03, pp 218-219).

The final elements of the false pretense and fraud charges involves "another person's" detrimental reliance on the misrepresentation and a loss of something of value. Similarly, as to common law fraud, only "another person" needs rely on the false pretense or false token.[16] The prosecution's apparent theory on common law fraud (completely inarticulated during trial) was that the contributors relied on false pretense, but that the Bush and Gore committees suffered losses of something of value from the fraud. However, the PACs contributed money in the manner the language in the solicitations stated -- to Democratic or Republican party organizations in closely contested "swing states" or to protect the Bush and Gore "victories," (although the State seized the money before Petitioner could contribute funds for Gore.)

Dominick Tringali testified that he would have been satisfied if his money went to Republican causes. (Tringali, Tr 6/26/03, p 462). Kathleen Westover believed that her money was going to Democratic interests[17] and Bruce Miller wanted to assist Gore.

---

16 As noted above, the Michigan Court of Appeals defines this element for false pretenses to require the victim's reliance but fails to define any elements for common law fraud.

17 Westover contributed in response to the Recount Fund letter. Petitioner maintains that no money was ever sent to the Democrats

(Westover, Tr 6/26/03, p 464; Miller, Tr 6/26/03, p 479). Swing States and Friends contributed to Republican and Democratic institutions in certain "swing" states respectively, thereby satisfying these contributors' goals. (Hensler, Tr 6/23/03, pp 200-201; Motley, Tr 6/23/03, pp 226-227; Motley, Tr 6/24/03, pp 249, 284; Exhibits E and F). Neither Tringali nor Miller lost anything of value. They voluntarily made monetary contributions to Democratic or Republican Party Presidential candidates. Tringali and Miller relied on representations that the PACs would assist their respective candidates in specific "swing states" and that is exactly where the PACs contributed the money. Any loss by Westover cannot be attributed to Dewald. Petitioner maintains that her donation would have reached her intended target less than two weeks after it was received had the money not been seized by the State.

Indeed, the contributors' likely identified themselves as fraud victims only due to the suggestive letters and questionnaires from the Michigan Attorney General. (Exhibits H, I and J). The letters never explained that Friends contributed only to Democratic institutions and Swing States only to Republican institutions. (Motley, Tr 6/24/03, p 284). During his testimony, Bruce Miller even indicated that he only became suspicious because the letter from the Attorney General's office told him that his money had been

for this purpose because the State seized the money.

54

"appropriated for private purposes." (Miller, Tr 6/26/03, p 484).
He believed this "[b]ecause they told me." (Id. 484).

In its closing arguments on common law fraud, the prosecution
argued that common law fraud is not about whether the contributors
relied upon the letters. (Prosecution Closing Argument, Tr 6/26/03,
pp 541-542). The prosecution argued only that Petitioner intended
to defraud those he communicated with, i.e., the donors. (Id. 543).
No evidence was presented that Petitioner communicated with the
Bush and Gore committees except to send contributions.

The prosecution argued that Mr. Miller suffered an independent
loss because he made a contribution in order to inform influential
Democrats of his participation.    (Miller, Tr 6/26/03, pp 488;
Prosecution Closing Argument, Tr 6/26/03, p 540).   However, the
Friends solicitation letters *never* claimed to provide this sort of
exposure or access.  Mr. Dewald should not face prosecution because
a contributor made an unfounded presumption about the potential
benefit of a political contribution.

Most people align themselves with one political party or
candidate.  Individuals contribute to campaigns to help their
preferred candidate.   The reality of modern American campaign
finance, however, is that many people and Committees contribute to
gain access to those with political power.  Plenty of corporations,
for instance, contribute to both parties.  Political professionals
often make a living by servicing opposing parties.  Indeed, during

55

the prosecution's case, Mark Grebner, a political consultant, explained that although he was a Democrat, his business sold contributor lists to both Republicans and Democrats. (Grebner, Tr 6/24/03, p 441). Republicans in a number of states, including Michigan, have gathered signatures to put Ralph Nader on the ballot, even though they would never vote for him. Similarly, Westover, a "lifelong Democrat" (Westover, Preliminary Examination Tr 9/19/02, p 538), sent money to McCain, not because she planned vote for him, but only to influence the outcome of the Republican primaries. (Westover, Tr 6/26/03, p 469). Many people find these realities of campaign finance reprehensible, but that does not make Mr. Dewald reprehensible or his activities illegal. Petitioner maintains that in spite of a lack of sufficient evidence, the jury's natural distaste for Mr. Dewald's activities resulted in his conviction.

The prosecution failed to prove any of the elements of the false pretense or fraud charges. There were no false representations, Mr. Dewald did not exhibit any intent to mislead, and the contributors to the PACs did not suffer any sort of loss attributable to Mr. Dewald. Mr. Dewald's case is far less ambiguous than other convictions reversed for insufficient evidence. See People v Pickett, 14 Mich App 1 (1968) (finding insufficient evidence for false pretenses where defendant gave false information in applying for a job, but no evidence showed he

56

could not perform the promised services). Compare <u>People</u> v <u>Vida</u>, 381 Mich 595 (1969) (finding sufficient evidence for false pretenses conviction where defendant made a purchase with bounced checks, and provided a false name, a false business, and a false motivation for the purchase).

**(2) The common law fraud charge should be reversed because the Bush and Gore campaigns suffered no harm from the alleged fraud.**

Even if the individual contributors suffered some harm (Petitioner claims they did not), Mr. Dewald should not be convicted of common law fraud. He was convicted of gross fraud at common law against the Bush and Gore campaigns, not the individual donors. (Jury Instructions, Tr 6/27/03, pp 619-620; Verdict, Tr 6/27/03, p 632). As already noted, common law fraud requires a showing that the victim sustained a loss. See <u>Belle</u> <u>Isle</u> <u>Grill</u> <u>Corp</u> v <u>City</u> <u>of</u> <u>Detroit</u>, 256 Mich App 463, 477 (2003).

In this case, the prosecution presented no evidence that the Bush and Gore campaigns suffered any loss due to the contributions made to Swing States and Friends. None of the three donors testified that they would have contributed money to the presidential campaigns if they had not received the solicitations from Swing States or Friends. There no evidence that the Bush or Gore committees were soliciting contributions from them during the primary campaign or the recount.[18]  Direct testimony reveals that

---

18  During the preliminary examination, Westover testified that she "... contributed to that because it's the only thing that

the candidate committees were prohibited by federal regulation from soliciting contributions for the activities of their general election campaigns (Graham, Tr 6/24/03, pp 351-353), as Mr. Dewald was doing, and could only solicit contributions for the retirement of primary campaign debts, a subject unlikely to motivate contributors like Westover, Tringali or Miller. The potential loss the campaigns suffered from the alleged theft of the mailing lists involved only the larceny by conversion charges, not the fraud or false pretense charge. No arguments were presented anywhere during trial that the lists were devalued as a result of gross fraud. This theory, and a specification of the victims, only emerged after Petitioner challenged the gross fraud charges on duplicity.

Indeed, during the resentencing hearing, the prosecuting attorney noted that "The committee itself isn't a victim of fraud. The committee itself is a victim under Count V [Larceny by conversion]." (Resentence Hearing, Tr 11/13/03, p 18).

The Court and the parties appeared to be more than a little confused about the construction and application of this common law crime. The prosecution argued to the Court that common law fraud does not require reliance, only later conceding that it does. (Prosecution Closing Argument, Tr 6/26/03, p 513). In both its proposed jury instructions and its closing arguments, the

came ... to me in the mail or I didn't get any other calls from any other groups that were soliciting funds to defray his legal expenses." (Westover, Preliminary Examination, Tr p 561-562).

prosecution asserted that "the Defendant intended to defraud those he communicated with." This could hardly be the Bush and Gore committees and there is no evidence to support this.

At times and to suit its purposes, the prosecutor argued that the Bush and Gore committees were the victims (Id.), even though this is neither alleged in the Information, the opening statement or the closing argument. (Prosecution Closing Argument, Tr 6/26/03, p 516). At other times, when it served an argument to enhance Petitioner's sentence, the prosecution denied the committees were victims and argued that the contributors were victims of both false pretenses and common law fraud. (Prosecution Argument at Resentencing, Tr 11/13/03, p 19). Upon contemplating the absence of stated victims in the Information, the Court decided to just submit it to the jury "and see what they say ... [T]hey may not understand it anymore than I do." (Court, Tr 6/26/03, p 517). This was not an isolated, off-the-cuff remark. The Court repeated itself in virtually identical words at the resentencing hearing.[19] In either case, the evidence was insufficient to prove the final element of common law fraud.

The loss alleged in the false pretenses and common law fraud charges affects only the individual contributors, not the political campaigns. The common law fraud charge should be reversed because

_____

19 "I don't know if [the jury] understood the file any more than I did ..." (Court, Sentencing, Tr 9/3/03, p 14).

59

the Gore and Bush political campaigns could not be and are not victims.

## B. Larceny by Conversion

The jury convicted Mr. Dewald on two counts of larceny by conversion,[20] one for the George Bush campaign and one for the Al Gore campaign. (Verdict, Tr 6/26/03, pp 632-633). The elements for conviction of larceny by conversion are: (1) the property must have some value;[21] (2) the property of another must be delivered to the defendant through legal or illegal means; (3) the defendant must convert the property to his own use; (4) the defendant must intend to defraud the owner of the property; and (5) the conversion of the property without consent of the owner. (Court, Tr 6/25/03, pp 621-623). People v Miciek, 106 Mich App 659, 664 (1981); People v Scott, 71 Mich App 16, 19 (1976). Additionally, in the instant case, the property must have had a fair market value of $20,000 or more at the time it was transferred.

### (1) There was insufficient evidence to prove Mr. Dewald intended to defraud the owner of the property.

---

[20] MCL 750.362 Larceny by Conversion:
Any person to whom any money, goods or other property, which may be the subject of larceny, shall have been delivered, who shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money or other property, or any part thereof, shall be deemed by so doing to have committed the crime of larceny and shall be punished as provided in the first section of this chapter.

[21] Dewald was charged pursuant to MCL 750.362a, under which the value of the converted property must be at least $20,000.

60

The prosecution argued that Dewald had committed larceny by conversion by downloading the donor lists from the FEC website and using them to solicit donations to Swing States and Friends. (Prosecution Opening, Tr 6/23/03, pp 81-82). The primary evidence was that the fundraising list provided by Mr. Dewald contained Bush campaign "salt" names, which are fictitious names inserted into the FEC donor list in order to detect people using the list for commercial purposes. (Motley, Tr 6/23/03, pp 210; Graham, Tr 6/24/03, pp 311, 365-366). These same "salt" names, however, also appeared on the lists available on other websites , including www.tray.com. (Motley, Tr 6/24/03, p 265; Graham, Tr 6/24/03, p 336; Sharpe, Tr 6/24/03, pp 405-406). On the Democratic side, Alison Sharpe, a compliance officer for the Gore campaign, testified that she became suspicious when she discovered that some of the solicitation letters from Friends duplicated typographical errors in their mailing list. (Id. 390-392). However, these misspellings appeared on other sites as well, including www.tray.com, and Sharpe admitted that there was no way to know from which site Friends had obtained the data. (Id. 405). Consequently, the prosecution failed to prove the fourth element of the charge -- Mr. Dewald's specific intent to defraud the candidate campaigns of their property.

There was no testimony at trial about how specifically Mr. Dewald obtained the target names of his solicitations. Mr. Dewald

61

maintains, and jurors could reasonably have inferred from the fact that the list data was available from a non-FEC source, such as www.tray.com, that Dewald obtained the data from an alternate source without any knowledge that he was taking protected Gore or Bush campaign material. In a parallel investigation, the FEC concluded that Dewald obtained these lists from tray.com and that tray.com did not, in fact, have any disclaimers as to prohibited use on this site. See Exhibit O, General Counsel's Report #3 Before the Federal Election Commission, pp 8, 11.[22]     The fact that American Political Lists, care of Mr. Dewald's ex-wife, received a $5,000 check from Swing States provided evidence from which the jury could have inferred that this third party provided the data without Mr. Dewald's knowledge of its illegal nature. Absent any concrete evidence of specific intent, this scenario is no less likely than than the prosecution's proposed scenario -- speculation in closing argument that the check to Mr. Dewald's wife actually showed the intent to defraud the campaigns of their property.

Both Graham, the witness for the Bush campaign, and Sharpe, the witness for the Gore campaign, testified that Mr. Dewald used the property of their respective committees without their permission. The argument that these lists are the property of the respective committees is belied by the FEC's own opinions. In AO

22     This information only emerged May 3, 2006, after the trial was completed and Mr. Dewald had been incarcerated for 17 months and subsequently paroled.

1984-2, (Exhibit N, appended), the FEC gave express permission for Friends of Phil Gramm to use publicly-disclosed lists of contributors to Americans for Phil Gramm, and suggests that "Friends" could also tell these contributors to request a refund from "Americans".

No evidence whatever was introduced to suggest that these lists were, by the FEC's definition, the property of the committees that disclosed them. Throughout the trial, sentencing and appeal, the committee's own lists, on the one hand, and information copied from FEC disclosure reports, on the other hand, were referenced interchangeably, a fact which necessarily confused jurors, the trial court and the appellate courts.[23]

---

23   For example, Alison Sharpe testified as follows at trial:

Q. When I say the Gore list, what do you think I mean?
A. In particular you would mean *anybody who donated to the campaign*.
Q. All right. So it's a list of donors?
A. Exactly.
Q. How is the list created?
A. It's created by people who donate to the campaign when you deposit your check *no matter how large or how small*. Then your name is kept by federal requirement in a database and that would be *our list*.

(Sharpe, Tr 6/24/03 p 373)(emphasis supplied). Petitioner maintains that although Sharpe's testimony is less than precise, she is explaining that this is the Gore database, not the FEC's database.

Later, she testified as follows on this topic:

Q. And the fact that Mr. Kleinfeld has a middle initial and Ms. Utrecht does not, do you draw conclusions from

63

Earlier, in AO 1979-3 (Exhibit K, appended) the FEC distinguished between property of the FEC and property of the committee which disclosed it. While there may be indirect evidence to suggest Mr. Dewald might have used lists derived from FEC disclosure, there is no evidence that Mr. Dewald obtained his lists from the committees' own lists (such evidence might include names of contributors who never appeared on FEC lists). Absent specific intent, there is insufficient evidence that Mr. Dewald intended to commit larceny by conversion. Accordingly, these two convictions should also be reversed.

### (2) There was insufficient evidence to that the property had a value over $20,000, or any value at all.

In both its opening statement and closing argument the prosecution argued that the value of the lists converted by Mr. Dewald was over $20,000. (Prosecution Opening, Tr 6/23/03, p 85,

---

that observation?
A. At that point, looking at *our filings*, realized that it was the same way that we had reported in each case.
Q. That when you reported the contribution from Ms. Utrecht to the Federal Election Commission, you reported it without the middle initial?
A. Which is exactly how it is on her check.
Q. And Mr. Kleinfeld with a middle initial?
A. Which is how it is on that, his check.
Q. And that peculiarity was consistent throughout these documents?
A. Yes, it was.
Q. What else caused you to believe that these names came from *your list*?

Id. 392 (emphasis supplied). See also Sharpe, pp 399, 412, where she suggests that "list" is not the committee's list, but rather Gore's own personal list.

102-103; Prosecution Closing Argument, Tr 6/27/03, pp 546, 561).

Mark Grebner, a political consultant, Alison Sharpe, a compliance

officer for the Gore campaign, and James Graham, the assistant

treasurer of the Bush campaign, all testified the lists had a

value over $20,000. (Grebner, Trial, 6/24/03, p 428-429, 431-432;

Sharpe, Trial, 6/24/03, p 418; Graham, Trial, 6/24/03, p 336).

However, Grebner testified at the preliminary examination that

the value of lists copied from FEC reports was zero or approaching

zero because it would be available without charge or a minimal

charge from the FEC. (Grebner, Preliminary Examination, Tr 9/18/02,

p 474).

The prosecution made no attempt throughout the trial to

distinguish between the committee's lists, on the one hand, and

information copied from FEC reports, on the other. The terms

"list," "report" and "filing" are used interchangeably, as if they

were identical. Sharpe answers "Yes" to this question: "Based on

your knowledge of the size of the two reports and your experience

in renting lists, were these reports worth more than $20,000?" (Id.

418). Similarly, Graham answers "Yes" to this question: "Based on

your experience, do you know if that filing, that list, the names,

addresses and information on that list is worth more than $20,000?"

Id. 336.[24]  Mark Grebner testified that both the Gore and the Bush

---

24    On cross-examination, Grebner stated that based on Mr.
Dewald obtaining the information from FEC filings, the Bush

"lists" are "worth in excess of $20,000", later qualifying this answer by saying that he had assumed when he was being asked the question, that "the question was, what was the right and ability to use this list worth?" Even later, he reduced his estimation of the lists' value to below $20,000 "if it were restricted to a single use." (Grebner, Tr 6/24/03, pp 428, 430, 432). However, 2 USC §438(a)(4) restricts a list compiled from FEC disclosure reports to a zero use as far as solicitation is concerned. Its value is far less than $20,000 -- zero or approaching zero. Both Sharpe and Graham based their valuation on their experience renting and leasing lists. But renting or leasing a list compiled from FEC reports is a commercial purpose that is not allowed under 2 USC §438(a)(4). The prosecution's stated theory is that Dewald used lists compiled from FEC reports. (Prosecution Opening, Tr 6/23/03, pp 81-82). The valuation of these lists by Grebner, Sharpe and Graham can only concern a list other than that which the prosecution asserts Dewald used.

Consequently the prosecution failed to prove the lists it alleges Mr. Dewald to have "stolen" had a value of $20,000 or any

___

campaign lost over $20,000 "because he didn't lease it from [the Bush campaign]. (Id. 355)

66

value at all and the convictions on these charges must be reversed.

**ARGUMENT IV**

**PETITIONER WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND HIS DUE PROCESS RIGHT TO PRESENT A DEFENSE WHERE THE TRIAL COURT ALLOWED THE PROSECUTION TO INTRODUCE IMPROPER EXPERT TESTIMONY INVOLVING LEGAL CONCLUSION AND IMPROPER CONCLUSIONS AS TO ULTIMATE FACTS, AND WHERE THE TRIAL COURT PRECLUDED PETITIONER FROM PRESENTING MATERIAL, EXPERT DEFENSE EVIDENCE.**

Due process is violated, and thus habeas relief warranted, if a state court evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." Ege v Yukins, 485 F3d 364 (6th Cir 2007); Bugh v Mitchell, 329 F3d 496, 512 (6th Cir 2003). "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." Brown v O'Dea, 227 F3d 642, 645 (6th Cir 2000). The state courts' rulings with respect to evidentiary issues meet the foregoing standard, and 28 USC §2254(d)(1), particularly when the errors are viewed in combination, because those decisions, which involved both the erroneous admission of prosecution evidence and the erroneous preclusion of defense evidence, amounted to an unreasonable application of the United States Supreme Court precedent in the case of Chambers v Mississippi, 410 US 284, 302-03 (1973). See also Ege, 485 F3d at 375.

**A. Impermissible prosecution testimony as to legal conclusions and ultimate facts:**

68

A number of prosecution witnesses provided legal and factual conclusions about Mr. Dewald's activities over defense counsel's objection. Multiple witnesses testified that Mr. Dewald's actions violated campaign finance laws. Multiple witnesses also testified to their conclusions that Mr. Dewald acted with the intent to defraud the PAC contributors. This evidence usurped the jury's role in finding facts. It is not surprising that the jury returned a guilty verdict where the court allowed a series of expert witnesses to testify to their ultimate conclusions of fact and law -- that Petitioner was guilty of the state crimes charged as well as other federal offenses.

The court allowed experts in campaign finance procedure and police investigation to testify that Mr. Dewald acted illegally. Kenneth Jones, former counsel to the Republican National Committee, testified that Mr. Dewald's use of candidates names in his solicitations violated campaign finance law. (Jones, Tr 6/23/03, pp 141-148). Jones also repeated the impermissible legal conclusions contained in a letter (Exhibit G, appended) which he had drafted and sent to Dewald advising him that the PAC's solicitation letter used the "GOP" trademark illegally, and that Mr. Dewald's contribution list was "taken from information given to the FEC against the Federal statute." (Id. 143-148, 153). Defense counsel objected to all of these statements. (Counsel, Tr 6/23/03, pp 142, 152). In the case of the first statement, the

69

court sustained counsel's objection, but the prosecution still elicited Mr. Jones' expert opinions about the legality of the language in the solicitations. (Jones, Tr 6/23/03, p 143-148).

The testimony of the investigating agent, Donovan Motley, provided the prosecution with an additional opportunity to provide legal conclusions for the jury. Reading from a campaign manual (Defendant's Trial Exhibit B), Motley testified that "the act prohibits anyone from selling or using the names and addresses of individual contributors copied from FEC reports for commercial purposes, or for the purpose of soliciting funds . . . FEC rules also prohibit a non-connected committee from using a candidate's name." (Motley, Tr 6/24/03, pp 302-305).

Over defense counsel objection, Motley reviewed FEC regulations and provided an expert opinion that Dewald acted criminally. (Id. 302, 303). In response to defense objections, the court stated "I have a very difficult time remembering everything that was questioned on. That's why I let people ask additional questions to cover areas because we are all human." (Id. 302). The prosecution relied upon these improper legal opinions during closing argument. (Prosecution Closing, Tr 6/26/03, p 544).

Expert prosecution witnesses also testified to their factual conclusions that Mr. Dewald acted illegally with their improper opinions about his alleged criminal intent. Over defense counsel's

70

objection, Motley stated that there was no doubt that Mr. Dewald was aware of the criminal investigation when he transferred $150,000 to Cyprus. (Motley, Tr 6/24/03, pp 236-237, 296-297). Similarly, over defense objection, the prosecution asked James Graham, the assistant treasurer of the Bush campaign, the source of Mr. Dewald's contributor lists. (Graham, Tr 6/24/03, p 364-365). Mr. Graham responded with the factual conclusion that Mr. Dewald obtained the information from the 1999 Bush campaign disclosures. (Id.). These factual findings fell within the exclusive province of jurors who were charged with the responsibility to analyze the evidence and determine Mr. Dewald's intentions and actions.

By not sustaining objections, offering limiting or corrective instructions, or declaring a mistrial, the court allowed the prosecution to present impermissible legal and factual conclusions to the jury.

A trial judge abdicates his responsibilities by permitting a witness to testify to legal conclusions. "Allowing witnesses to testify as to questions of law invites jury confusion and the possibility that the jury will accept as law the witness's conclusion rather than the judge's trial instruction." People v Lyons, 93 Mich App 35, 47 (1979) (finding that securities expert statement on securities law reversible error in criminal prosecution). See also People v Drossart, 99 Mich App 66, 76 (1980) (holding that medical expert may not testify on law of

71

insanity); People v Matulonis, 115 Mich App 263, 268 (1982) ("an expert witness's opinion of the law is both incompetent and irrelevant").

In Lyons, the defendant was charged with fraudulent practices under the Uniform Securities Act. A witness interpreted that Act for the jury. The Court of Appeals held as follows:

... the court erred in allowing Gunn to testify, over defendant's objection, concerning the legal definition of a security under the Act. The general rule is that courts will not permit even expert witness testimony on a question of domestic law because it is the exclusive responsibility of the trial judge to find and interpret the applicable law.

Lyons, 93 Mich App at 45-46. See also McCormick, Evidence (2d ed.), §§12, 335, pp 28-29, 776-777; 7 Wigmore, Evidence (Chadbourn Rev.), §1952, pp 103-104. See also Marx & Co., Inc. v Diners' Club, Inc., 550 F2d 505 (2nd Cir 1977); Huff v United States, 273 F2d 56, 61 (5th Cir 1959).

During Petitioner's state court appeal, the prosecution argued that the Lyons doctrine only prohibits testimony concerning the "applicable" law; that the applicable law in this case is limited to the criminal statutes involving fraud, false pretense and conversion; and that its experts did not opine as to these state criminal laws. Prosecutor's Brief on Appeal, pp 30-31. The prosecution's argument is plainly incorrect. This argument ignores that the "applicable law", in fact the *only* law which should have been applied to the facts of this campaign finance case, is FECA.

(See Argument I, supra). Moreover, not only did the prosecution's expert comment impermissibly on the law, the expert's opinion was legally incorrect because it was not tempered with, or qualified by, the First Amendment safe harbor provisions of FECA.

Similarly, the factual conclusions presented by the prosecution witnesses usurped the jury's fact-finding function. The testimony should have been excluded as evidence outside the scope of a witnesses personal knowledge. MRE 602. These conclusions, as to Mr. Dewald's state of mind and intentions, were potentially inaccurate and certainly more prejudicial than probative under MRE 403. It was error for the court to admit the factual conclusions of Donovan Motley and James Graham.

The Michigan Court of Appeals rejected this claim (impermissible opinion as to ultimate factual conclusions) by finding that the testimony did not pertain to the defendant's guilt or innocence of the charges brought here. However, when a witness is allowed to testify as to whether or not the defendant was "aware" of the investigation when he transferred PAC money out of the country, this factual conclusion is directly probative of an ultimate issue in the case -- the defendant's criminal intent. The Court rejected the legal conclusion aspect of the claim by finding that the witness was simply reading from a letter and an FEC campaign guide that were already in evidence. Petitioner disagrees. First, as noted above, the witnesses went beyond the

73

content of the letters, offering their own opinions. Second, whether through direct testimony or in the form of testimony which quotes from a letter, the impact is the same. The improper evidence is still in the record and the Lyons doctrine applies.

These impermissible factual and legal conclusions prejudiced Mr. Dewald at trial. The jury had prosecution experts explain to them that (a) Petitioner broke the law and (b) he harbored fraudulent intent. The court's error in admitting this evidence requires a new trial.

## B. The trial court's preclusion of defense testimony:

The trial court's denial of Petitioner's attempt to call a witness amounted to a violation of his Sixth Amendment right to present a defense and to compulsory process for obtaining witnesses in his favor. Defense counsel attempted to call an elections witness to testify about publicly available campaign finance information. The witness would have provided evidence that a web site called www.tray.com contained the same contribution data lists as the FEC website, and did not include the prohibitions against the use of the data for commercial purposes. (Defense Counsel, Tr 6/26/03, p 521). The court excluded the witness on relevancy grounds, holding that a three-month time gap and the posting format difference made his testimony inadmissible. (Court, Tr 6/26/03, pp 526-527). The court also found that Mr. Dewald could be found guilty of larceny by conversion regardless of whether or not the

contributor lists came from a site that posted warnings. (Id. 528).

This ruling was clearly erroneous, and it deprived Petitioner of a fundamentally fair trial. The witness's testimony would have been critical to Mr. Dewald's defense against the charges of larceny by conversion. Under Michigan law, the larceny charges required the jury to find that Mr. Dewald had the specific intent to defraud the rightful owner of the property. (Court, Jury Instructions, Tr 6/27/03, pp 622-624). See People v Miciek, 106 Mich App 659, 664 (1981). Testimony by the expert witness would have negated this specific intent for the jury by showing that Mr. Dewald did not knowingly use prohibited information. Just as importantly, the expert testimony would have eliminated some of the jury's negative feeling toward Mr. Dewald by demonstrating that he could have obtained his contributor information in an innocent manner.

The witness would have testified that www.tray.com had no warnings against using the data for commercial purposes, which meant that users of the site were not on notice that such activity constituted a crime. (Counsel, Tr 6/26/03, p 521). This scenario would also explain why Mr. Dewald duplicated typographical errors from the Gore campaign in his solicitations and reported Republican "salt" names in his fundraising list. Petitioner maintains that he obtained the information from a non-FEC source that lacked

75

notice of restrictions on its use for commercial purposes. He maintains that he did not know that the use of the lists was illegal and he did not exhibit the intent to defraud the campaigns that created the lists. He maintains that he simply obtained material from an alternate public source to use in his fundraising business. FEC's General Counsel likewise has concluded that there was reason to believe that Dewald actually did obtain the lists from tray.com and that they actually did not contain any warnings at all. Exhibit O, MUR 5155, General Counsel's Report #3, p 7 , n 8, and p 8.

The trial court found that the availability of the information on other websites did not affect the legal protection afforded to the contributor lists. (Court, Tr 6/26/03, p 528). However, the absence of restrictions on these websites provided evidence for Mr. Dewald's lack of intent to defraud in using these restricted lists. Based upon this evidence, the jury would have had reasonable doubt as to his guilt of larceny by conversion.

The trial court also found the evidence to be inadmissible on relevancy grounds, noting that the testimony as to the content of www.tray.com involved a time period two months after the Bush/Gore election. (Id. 526). However, this fact did not eliminate the relevance of the proposed testimony -- i.e., that other public sources contained the contributor lists without notice of the restrictions on commercial use. At most, the time frame

76

discrepancy goes to the weight of the witness's proposed evidence, not to admissibility, and consequently, jurors could have considered it in their deliberations. The trial court also noted that the tray.com information was presented in a different format. (Id. 527). However, a different format does not change the fact that somebody could still obtain FEC disclosure information from www.tray.com. This witness's testimony could have cast doubt on Graham's demonstration of electronic downloading from the FEC web site by showing how the information could have been obtained from the tray.com web site and downloaded without using the FEC's electronic format. This evidence was excluded simply because the Court was unaware that all information on every web site is electronic and can be downloaded with commonly available software.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The potential problems that the court cited with the expert testimony did not alter a defense presentation that would have shown it "more probable" that Mr. Dewald lacked the intent to defraud in converting the Bush and Gore campaign lists, and did not obtain the lists he used from the FEC web site.

The prosecution argued that the witness's testimony was cumulative because the defense was able to establish via cross-

77

examination that the FEC data was available on other websites, including www.tray.com. (Motley, Tr 6/24/03, p 265; Graham, Tr 6/24/03, pp 334-336; Sharpe, Tr 6/24/03, pp 405-406). However, the crucial piece of information for the defense was that www.tray.com lacked restrictions on the use of information for commercial purposes. No prosecution witness could verify this fact, so jurors would have been left with the erroneous impression that all locations where the FEC data could be obtained had comparable warnings banning commercial use. (Graham, Tr 6/24/03, p 338). The proffered defense witness also could have provided proper rebuttal testimony to the prosecution witness statements about www.tray.com. The defense expert would have testified that www.tray.com included the addresses of the contributors, a fact which prosecution witness, James Graham, had denied. (Graham, Tr 6/24/03, p 336; Counsel, Tr 6/26/03, p 524).

This witness's testimony would have shown the jury the possibility that Mr. Dewald obtained restricted material through legitimate means, without knowledge of their restrictions, thereby negating his specific intent to commit this crime.

Under both the United States and Michigan Constitutions, a defendant has the right to produce witnesses and to present a defense. Michigan Compiled Law 763.1 provides that the defendant "shall be allowed to be heard by counsel and may defend himself, and he shall have the right to produce witnesses and proofs in his

favor." People v Merritt, 396 Mich 67, 83 (1976); US Const Amend VI. The trial court greatly prejudiced Mr. Dewald by denying him any opportunity to defend himself, as evidenced by FEC General Counsel's Report, referenced above. Exhibit O. Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v Mississippi, 410 US at 302. The expert would have been Mr. Dewald's *only* defense witness.

The court's preclusion of the expert witness prejudiced Mr. Dewald and resulted in his receiving a fundamentally unfair trial. The expert's testimony would have negated fraudulent intent in Mr. Dewald's use of campaign contributor lists, and, as such, a jury could have had reasonable doubt as to the larceny by conversion charges. In fact, the testimony might even have influenced the jury's deliberations on the other charges by removing their negative perception of Mr. Dewald's use of FEC disclosure information. The trial court's error was not harmless -- armed with all of the pertinent information regarding the tray.com web site, the FEC's own counsel reached a conclusion that Petitioner was not guilty of this charge.

For these reasons as well, Petitioner's convictions should be overturned.

## RELIEF REQUESTED

WHEREFORE, based upon all of the foregoing, Petitioner Jerome Dewald prays for an order granting his petition for habeas corpus pursuant to 28 USC §2254.

Respectfully submitted,

Dated: September 24,2008

Carole M. Stanyar
CAROLE M. STANYAR P34830
Attorney for Petitioner
3060 Penobscot Building
645 Griswold Avenue
Detroit, Michigan 48226
(313) 963-7222
*cstanyar@wowway.com*

## PROOF OF SERVICE

CAROLE M. STANYAR, being first duly sworn, deposes and says that on the 24th day of September, 2008, she served a copy of Petition, Brief and Exhibits in Support of Petition for Writ of Habeas Corpus on Michael P. Cox, Assistant Michigan Attorney General, an ECF filer, miag@michigan.gov,.

Dated: September 24, 2008

Carole M. Stanyar
CAROLE M. STANYAR P34830
Attorney for Petitioner
3060 Penobscot Building
645 Griswold Avenue
Detroit, Michigan 48226
(313) 963-7222
*cstanyar@wowway.com*