UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

JEROME WESTFIELD DEWALD,            )
                                    )
                 Petitioner,        )        Case No. 1:08-cv-906
                                    )
v.                                  )        Honorable Paul L. Maloney
                                    )
GENE WRIGGLESWORTH,                 )
                                    )        **REPORT AND RECOMMENDATION**
                 Respondent.        )
_____ )

        This is a habeas corpus proceeding brought by a former state prisoner, through

counsel, pursuant to 28 U.S.C. § 2254.  An Ingham County jury convicted petitioner of two counts

of obtaining money under false pretenses, MICH. COMP. LAWS § 750.218, two counts of common-

law fraud, MICH. COMP. LAWS § 750.280, and two counts of larceny by conversion, MICH. COMP.

LAWS § 750.362.  On September 3, 2003, the Ingham County Circuit Court sentenced petitioner to

concurrent terms of incarceration, as follows:  24-to-60 months on count 1 (false pretenses); 90 days

in jail on count 2 (false pretenses); and 30-to-120 months on counts 3 and 4 (fraud) and on counts

5 and 6 (fraud and larceny by conversion).  On November 13, 2003, the court resentenced petitioner

on counts 3 through 6, reducing his sentence to 23-to-120 months, on account of a State guideline

miscalculation.  Petitioner challenged his convictions without success on direct and collateral review

in the State courts.  His attorney filed a habeas corpus petition on September 26, 2008.  By the time

the petition was filed, petitioner's sentences on the two false pretense convictions had been fully

served.  His sentences on counts 3 through 6 had not yet expired, and he was on parole at the time the petition was filed.

Petitioner's convictions arose from his activities in running two political action committees in connection with the 2000 presidential election.  The habeas corpus petition challenges his convictions on the following grounds:

(a)     Petitioner's prosecution for State crimes arising from his operation of political action committees was preempted by the Federal Election Campaign Act.

(b)     Petitioner's conviction for false pretenses and common-law fraud impinge upon rights guaranteed by the First Amendment.

(c)     The evidence was insufficient to support petitioner's convictions on any count.

(d)     The trial court's evidentiary rulings deprived petitioner of a fundamentally fair trial.

The State Attorney General has filed an answer to the petition, supported by the state-court record. Petitioner's counsel has filed a reply to the answer.

Chief Judge Paul Maloney has referred this matter to me for review of the record and issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Habeas Corpus Proceedings in the District Courts.  Upon review of the record and the submissions of the parties, I conclude that this court lacks subject-matter jurisdiction to entertain a habeas corpus challenge to petitioner's convictions on counts 1 and 2 (false pretenses) because petitioner was not in custody on those convictions at the time he filed his petition.  I further conclude that petitioner's prosecution for common-law fraud and larceny by conversion was clearly preempted

-2-

by the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431-455, and that the decision of the Michigan Court of Appeals rejecting the preemption defense was objectively unreasonable. I therefore recommend that petitioner be granted habeas corpus relief on counts 3 through 6. In light of the recommended disposition of this case on the ground of preemption, it is not necessary to reach petitioner's other challenges to the validity of his convictions on these counts.

### Proposed Findings of Fact

### I.        Trial-Court Proceedings

The only issue analyzed in this report and recommendation is the preemptive effect of the FECA on petitioner's conviction for common-law fraud and larceny by conversion. Although the trial testimony was extensive, it is not necessary for purposes of analyzing the preemption defense to review the trial testimony in detail. The preemption defense is principally legal in nature, and resolution of the habeas corpus petition requires only two ultimate factual findings: (1) the fraud prosecution was expressly predicated on petitioner's use of the names of candidates in his solicitation letters, allegedly creating the false impression that petitioner's PACs were affiliated with the candidate campaigns; and (2) the larceny by conversion convictions were expressly predicated upon proof that petitioner used donor lists published by the Federal Elections Commission (FEC) for purposes forbidden by federal law. Because each of these areas is expressly regulated by the FECA, the fraud and conversion prosecutions were preempted.

The state-court prosecution arose from petitioner's running of two political action committees (PACs) during the 2000 presidential election campaign. The PACs were Friends for a Democratic White House ("Democratic PAC") and "Swing States For a GOP White House ("GOP

PAC").  Petitioner registered each PAC with the Federal Election Commission in the fall of 2000, in connection with the presidential campaign between Albert Gore and George W. Bush.  He created a for-profit corporation, called PAC Services, to provide consulting and administrative services to each PAC.

The criminal charges against petitioner were based on fund-raising letters sent out by each PAC during the election campaign and the ensuing vote recount.[1]  The initial solicitation letter sent out by the GOP PAC on October 12, 2000, contained the following statement:  "We are calling on a select few of the most generous individual supporters of George W. Bush in these last days of the 2000 campaign to help raise a final $1 million before October 26th to capture the electoral votes in these critical swing states. . . ."  (Ex. A).  The initial solicitation from the Democratic PAC similarly appealed for funds "from the most generous individual supporters of Al Gore."  (Ex. B). During the vote recount proceedings that followed the election, petitioner caused his PACs to send out further solicitation letters, the GOP PAC appealing to "individual supporters of George W. Bush to help raise $3 million before December 1 to protect our hard-won victory," (Ex. C), while the Democratic PAC letter was directed to "the most generous individual supporters of Al Gore."  (Ex. D).  Both of the solicitation letters used return addresses on Pennsylvania Avenue in Washington, D.C.  Petitioner mailed these solicitations to political donors whose names were reported to the Federal Election Commission by the Democratic and Republican parties.  The FEC posted these

---

[1] Copies of these letters are found in the Michigan Court of Appeals record (docket # 25) and are also appended to petitioner's habeas corpus brief as exhibits.  This report and recommendation will refer to the letters by the exhibit numbers given them as attachments to petitioner's brief (docket # 2).

donor lists on its website, accompanied by a warning that the lists are for informational purposes only and may not be used for commercial or solicitation purposes.

Petitioner's PACs collected around $750,000 in contributions. Much of the money went to petitioner's for-profit corporation, PAC Services. Each PAC did indeed make political contributions to political organizations such as the national or State Republican and Democratic parties or other PACs. These contributions represented about seventeen percent of the PACs' receipts. The State ultimately seized $160,000.00 from petitioner's PACs. It is undisputed that each PAC reported its receipts to the FEC as required by federal law.

The prosecution for obtaining money under false pretenses was based on the contentions that the fund-raising letters created the false impression that the PACs were affiliated with the Bush or Gore campaigns and the further false impression that the writer knew that the persons solicited had been past donors to those campaigns. The prosecution called witnesses who testified that the language and the presentation of the solicitation letters tricked them into believing that the PACs were somehow affiliated with either the Bush or the Gore campaigns. (TT III, 453, 481). In final argument, the Assistant Attorney General asserted that the basis of the false pretense was the use of candidate names in the solicitations, which was "against the rules." (TT III, 537).

The two counts of common-law fraud were essentially duplicative of the false pretenses charges, but the alleged victims were the Bush and Gore campaigns. The Information for count 3 alleged that petitioner committed a "gross fraud or cheat at common law by intentionally misleading language in solicitation letters which imply affiliation with the Democratic party's efforts to elect Al Gore President of the United States." The Information for count 4 alleged that petitioner committed a gross fraud or cheat at common law "by intentionally misleading language in

-5-

solicitation letters which imply affiliation with Republican party's efforts to elect George W. Bush President of the United States." (Information found in Mich. S. Ct. record, docket # 29; docket # 18, TT I, 71-72). The alleged victims of these offenses were the Bush and Gore campaigns themselves, not the donors. "The fraud counts would encompass the loss to the Gore and the Bush campaigns." (Statement to Court by Assistant Attorney General) (docket # 20, TT III, 514).

The Assistant Attorney General emphasized in final argument that the theory of the common-law fraud counts (counts 3 and 4) was petitioner's false implication of a connection between his PACs and the presidential candidates:

> So in Counts 3 and 4 you're asked to judge if the Defendant intended to defraud those he communicated with by intentionally mislead -- by using intentionally misleading language in solicitation letters, which implied affiliation with the Republican party's efforts to elect George Bush President of the United States and alternatively Al Gore President of the United States.

(TT III, 543). This theory hinged on the alleged illegality under federal law of the use of the candidate's names.

> If you review these letters and say, I don't think this language is misleading, I don't think this language is misleading, I don't think that the use of George Bush's and Al Gore's name, *even though it's prohibited by the FEC rules* -- and you'll get to see that in the evidence, as well, because you'll get to take with you the Defendant's Exhibit B [1995 Federal Election Commission Campaign Guide]. . . .

(*Id.* at 543-44, emphasis added). "The FEC rules also prohibit a non-connected committee from using a candidate's name and the name of a special project, such as a fund-raising or advertising project." (*Id.* at 544).

Counts 5 and 6, charging larceny by conversion, were based on the theory that the names and addresses used by petitioner's PACs were taken from the FEC disclosures made by the campaigns of the Gore and Bush committees. The criminal Information for these counts alleged that

petitioner "fraudulently used [ ] intellectual property" belonging to the campaigns, namely "president campaign contributor names and addresses . . . made available through mandatory filings with the Federal Election Committee [sic]."  (Information found in Mich. S. Ct. record, docket # 29; TT I, 72).  In explaining this charge in opening statements, the Assistant Attorney General found it necessary to mention the Federal Election Commission (FEC) and its rules constantly.  (*Id.* at 80-103).  The prosecution emphasized that the FEC posted these lists with an appropriate restriction on their use, and that petitioner converted the lists to his own use without the owner's consent, by using the lists for solicitation in violation of the FECA.

       To prove that petitioner was not allowed under federal law to use the FEC donor lists for his own purposes, the prosecution called Kenneth Jones, a former attorney for the Republican National Committee and an expert in federal campaign finance law.  (TT I, 131-32).  In response to questioning by the Assistant Attorney General, Mr. Jones testified that "based on a federal statute, you are prohibited from compiling data turned in to the Federal Election Commission and using it for any commercial purpose."  (TT I, 145).  He testified that "[t]he federal prohibition on using data given to the FEC is fairly broad," and that "you can't use data given to the FEC for any commercial purpose."  (*Id.* at 146).  "The point of giving data to the FEC is for public disclosure, so people can see who is giving to which candidates."  (*Id.*).  He also invoked and cited an FEC regulation, 11 C.F.R. § 102, which says that "[n]o unauthorized committee shall include the name of any candidate in its name."  (*Id.* at 147).  Jones testified that he sent a cease-and-desist letter to petitioner because

"we thought that the names they were soliciting were taken from information given to the FEC against the federal statute." (*Id.* at 153; Ex. G).[2]

In final argument, the Assistant Attorney General referred to petitioner's use of the list as "stealing and converting to your own use the intellectual property of the George W. Bush and the Al Gore for President campaigns." (TT III, 545). The prosecutor emphasized that the campaigns sent their donor reports to the FEC and that the commission is required to make this information available to the public. "It's good government." (*Id.* at 548). In arguing that petitioner had the requisite criminal intent, the prosecutor asserted: "He knows full well, as I just read in the use restrictions, the [A]ct [Federal Election Campaign Act] prohibits anyone from selling or using the names and addresses of individual contributors copied from FEC reports for commercial purposes or for the -- for purpose of soliciting funds." (*Id.* at 558).

Petitioner was convicted on all six counts, as charged. He appeared before Judge William E. Collette for sentencing on September 3, 2003. (Sentencing Transcript (ST), docket # 22). After hearing allocution, Judge Collette sentenced petitioner to the following concurrent terms: 24-to-60 months on count 1 (false pretenses); 90 days in jail on count 2 (false pretenses); 30-to-120 months on counts 3 and 4 (common-law fraud); and 30-to-120 months on counts 5 and 6 (larceny by conversion). (*Id.* at 26). The court revoked bond and remanded petitioner to jail. (*Id.* at 27). On November 13, 2003, the court entered an amended judgment, reducing petitioner's minimum sentence on counts 3 through 6 to 23 months, but otherwise leaving the sentences undisturbed.

---

[2] The FECA allows reporting parties to put ten pseudonyms in the lists they disclose to the FEC, to aid in the detection of unauthorized use of the names and addresses of contributors. 2 U.S.C. § 438(a)(4). Witnesses referred to these names as "salts." (TT II, 311). Petitioner's PACs mailed solicitations to "salt" names, which tended to prove that petitioner's donor lists had their genesis in FEC-maintained disclosures. (*Id.* at 316-19).

## B.       Direct Appeal

Petitioner, represented by new counsel, appealed as of right to the Michigan Court of Appeals.  While his appeal was pending, his appellate counsel filed a motion for new trial in the Ingham County Circuit Court, asserting that the convictions should be vacated because of federal preemption under the FECA.  The court conducted a hearing on the motion on June 16, 2004.  (Tr., docket # 24).  The trial court summarily denied the motion for new trial at the conclusion of the hearing.

Appellate counsel filed a brief raising the following six issues for review:

I.      There is insufficient evidence to convict [Petitioner] of false pretenses, common law fraud, or larceny by conversion. These convictions are therefore in violation of his state and federal constitutional rights to due process of law.

II.     [Petitioner's] convictions for false pretenses, common law fraud, and larceny by conversion all stem from activity involving federal campaign finance. Since this field is covered by a federal statute, which preempts state law, his convictions must be vacated.

III.    The trial court denied [Petitioner] his constitutional right to present a defense by precluding him from presenting his expert witness.

IV.     [Petitioner's] state and federal constitutional due process rights to a fair trial were violated by the court impermissibly allowing the use of factual and legal conclusions throughout the trial.

V.      The restitution amount ordered by the court represents an arbitrary abuse of discretion.

VI.     [Petitioner] is entitled to re-sentencing because judicial fact-finding increased his authorized maximum sentence from a determinate jail term to a prison sentence in violation of his constitutional right to a jury trial.

(Appellant's Brief on Appeal, filed 9/21/2004, at i, found in Michigan Court of Appeals record, docket # 25).  Petitioner filed a *pro se* brief raising eight issues, which were essentially duplicative of the claims raised by counsel.

By *per curiam* opinion issued May 12, 2005, a panel of the Michigan Court of Appeals affirmed petitioner's convictions.  *People v. Dewald*, 705 N.W.2d 167 (Mich. Ct. App. 2005).  In reviewing the sufficiency of the evidence to support a conviction on two counts of obtaining money under false pretenses, the Court of Appeals confirmed that the gravamen of the charge was petitioner's use of the candidate's names in his solicitation letters to create the false impression of affiliation:

> Defendant, through the solicitation letters, represented that he was affiliated with either the Bush campaign or the Gore campaign and the language in his letters implied that he knew the individuals to be past donors to the campaign.  Defendant used the candidates' names in his solicitation letters.  Defendant's later letters represented that he was affiliated with the recount effort of each campaign after the election.  These representations were not true because defendant's PACs were not affiliated with either party or its recount effort.

705 N.W.2d at 173.  In support of a finding that petitioner had the requisite criminal intent, the court referred to evidence "that defendant used the candidates' name in his solicitation letters, knowing that this use was illegal."  *Id.*  The court referred to a guide published by the FEC, which "clearly stated that it was not proper for a PAC to use a candidate's name in its solicitations."  *Id.*  Turning to the common-law fraud counts, the court recited that petitioner's convictions "were based on the losses suffered by the Bush and Gore campaigns as a result of defendant's solicitation of Bush and Gore donors."  *Id.* at 174.  "Testimony at trial showed that defendant collected more than $700,000 in donations using the campaign lists of Bush and Gore contributors."  *Id.*  The court cited expert testimony at trial, showing that the "repeated use of these lists decrease their value, resulting in the

-10-

campaign's suffering a loss." *Id.* Affirming the convictions for larceny by conversion, the court found that the evidence presented at trial "supported the theory that defendant illegally used each campaign's FEC disclosure of contributors." *Id.* The conversion consisted of using the posted donor lists for an improper purpose: "The FEC guide and website both contain warnings that these lists were not to be used for solicitation purposes. By using the lists for solicitation purposes, defendant defrauded the political parties by soliciting further contributions from past donors, while implying that his PACs were affiliated with the campaigns." *Id.* at 174-75.

The Michigan Court of Appeals considered and rejected petitioner's claim that prosecution was preempted by federal law. After reciting a few general standards regarding preemption analysis, the court rejected preemption in a single paragraph:

> Congress stated that the provisions of the Federal Election Campaign Act (FECA) "supersede and preempt any provision of State law with respect to election to Federal office." 2 USC 453. However, federal courts have held that "'courts have given section 453 a narrow preemptive effect in light of its legislative history.'" *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280 (C.A.5, 1994), quoting *Stern v. Gen. Electric Co.*, 924 F.2d 472, 475 n. 3 (C.A.2, 1991). Additionally, federal courts have held that Congress did not intend the criminal sanctions of the FECA to be a substitute for all other possible criminal sanctions. *United States v. Trie*, 21 F Supp 2d 7, 19 (D.D.C., 1998), citing *United States v. Hopkins*, 916 F.2d 207, 218 (C.A.5, 1990), *United States v. Curran*, 20 F.3d 560, 566 (C.A. 3, 1994), and *United States v. Oakar*, 924 F.Supp. 232, 245 (D.D.C., 1996), aff'd in part and rev'd in part on other grounds, 111 F.3d 146, 324 U.S. App DC 104 (1997). Defendant was charged with and convicted of Michigan state-law crimes. These crimes are not specifically preempted by 2 USC 453. Defendant does not cite another portion of the federal statute that specifically preempts a state from pursuing criminal charges when the crimes are brought against a factual background that involves an election. There is also no conflict between state and federal law in this area. Defendant's convictions for the crimes at issue were not barred by the FECA. Thus, we reject defendant's federal-preemption argument.

705 N.W.2d at 175. The court rejected petitioner's other claims, which are not germane to the present analysis.

Petitioner, acting *in pro per*, applied for leave to appeal to the Michigan Supreme Court, raising the same arguments rejected by the Court of Appeals.  By standard order entered August 29, 2006, the State Supreme Court denied leave to appeal.  (*See* Mich. S. Ct. record, docket # 27).

In July 2007, petitioner filed a motion for post-judgment relief in the trial court, pursuant to Mich. Ct. R. 6.500.  The motion, filed by new counsel, raised a challenge under the First Amendment to petitioner's prosecution for disbursing funds from PACs.  On July 31, 2007, the trial court denied the motion.  The Michigan Court of Appeals denied discretionary review by order entered December 3, 2007, finding that petitioner had failed to meet the burden of establishing entitlement to relief.  (Mich. Ct. of App. record, docket # 28).  On June 23, 2008, the Michigan Supreme Court denied discretionary review on identical grounds.  (*See* Mich. S. Ct. record, docket # 29).

Petitioner, represented by yet another attorney, filed the instant habeas corpus proceeding on September 26, 2008.  The petition raises four grounds for review, each of which was raised and rejected on direct or collateral review.

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating

state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.")(quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that State-court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a State conviction cannot be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010).

In determining whether a State court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a habeas court may look only at the holdings, as opposed to the dicta, of Supreme Court cases as of the time of the relevant State-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). The "clearly established federal law" consists of the "governing legal principle or principles set forth by the Supreme Court." *Id.* at 71-72. This does not mean, however, that the Supreme Court must have decided the precise issue facing the habeas court. "[T]he 'lack of an explicit statement' of a particular rule by the Supreme Court 'is not determinative' of clearly established law, since 'the Court has made clear that its relevant precedents include not only bright-line rules but also legal principles and standards flowing from precedent.'" *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)); *accord Goodell v. Williams*, 643 F.3d 490, 496 (6th Cir. 2011).

## Discussion

### I.      Habeas Corpus Jurisdiction:  "In-Custody" Requirement

Federal habeas corpus relief is not another layer of appellate review for State convictions. Rather, habeas corpus is available only on the ground that a person is "in custody" in violation of the federal Constitution or laws. 28 U.S.C. §§ 2241(c), 2254(a). The Supreme Court has made it clear that the "in-custody" requirement is a prerequisite for subject-matter jurisdiction. *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989). For the reasons set forth below, I conclude that petitioner was not in custody on either of the false pretenses convictions at the time he filed his petition on September 26, 2008.

Petitioner appeared for sentencing on September 3, 2003. (*See* Sentencing Transcript (ST), docket # 22). The court imposed a sentence of 24-to-60 months on count 1 (felony false pretenses). On count 2 (misdemeanor false pretenses), the sentence was 90 days in jail. The court imposed sentences of 30-to-120 months on counts 3 through 6 (common-law fraud and larceny by conversion). All sentences were ordered to run concurrently. (ST 26). At the conclusion of the hearing, the court revoked bond and remanded petitioner to jail. (ST 27).[3] As a consequence of the remand, petitioner began to serve his concurrent sentences on September 3, 2003, with one day credit for time served.

Under Michigan law, when a prisoner is serving concurrent sentences, the longest maximum sentence controls the time of his incarceration; the shorter sentences are referred to as "non-controlling sentences." *See Lickfeldt v. Dep't of Corr.*, 636 N.W.2d 272, 274 (Mich. Ct. App. 2001). Under State law, each non-controlling sentence terminates upon completion of its maximum term, less applicable good time or disciplinary credits. *Id.* A non-controlling sentence terminates on the completion of its maximum term, "even if the offender is not eligible for discharge." *See Michigan Dep't of Corr. Policy Directive* No. 03.01.135 ¶ KK (eff. 1/1/2007).[4] Although the non-controlling sentences *terminate*, the prisoner is not *discharged* until he is released on the longest, controlling sentence. *Lickfeldt*, 636 N.W.2d at 275. Petitioner's sentences on counts 1 and 2 were non-controlling, because they ran concurrent to the much longer sentences on counts 3 through 6.

---

[3] The court subsequently resentenced petitioner on counts 3 through 6, reducing the concurrent sentences on those convictions to a term of 23-to-120 months. The sentences on the false pretenses convictions were left undisturbed.

[4] The policy directive was amended effective June 22, 2009, after petitioner was released, but its provisions material to this case, although renumbered, remain substantively unchanged.

Under Michigan law, petitioner's sentence on count 1 terminated upon expiration of its maximum term of 60 months -- no later than September 3, 2008.  The misdemeanor sentence on count 2 terminated no later than December 1, 2003, ninety days after sentencing.  Petitioner remained in custody on the four longer, controlling sentences.  The habeas corpus petition was filed on September 26, 2008.

A habeas petitioner must satisfy the custody requirement at the time the habeas action is filed.  *Spencer v. Kemma*, 523 U.S. 1, 7 (1998).  A petitioner is not in custody for purposes of a section 2254 proceeding if his sentence is fully expired at the time the petition is filed.  *Maleng*, 490 U.S. at 490-92; *accord Gavin v. Wells*, 914 F.2d 97, 98 (6th Cir. 1990) (court lacks jurisdiction over a direct attack on a conviction that was fully served prior to the filing of the petition).  When a petitioner is serving *consecutive* sentences, the petitioner remains in custody under any one of them until all sentences have been served.  *See Garlotte v. Fordice*, 515 U.S. 39, 41 (1998); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968).  Petitioner in the present case, however, was serving *concurrent*, not consecutive, sentences.

The Supreme Court has never held that a prisoner may bring a habeas corpus case to challenge a completely expired concurrent sentence.  The law is to the contrary.  In *Mays v. Dinwiddie*, 580 F.3d 1136 (10th Cir. 2009), the habeas petitioner was in custody on the longer of two concurrent sentences.  He attempted to challenge a burglary sentence that, like the false pretense sentences in the present case, had expired at the time the habeas petition was filed.  The Tenth Circuit affirmed dismissal of the challenge to the burglary conviction, on the ground that the petitioner was no longer "in custody" on that sentence and that the habeas court therefore lacked subject-matter jurisdiction under section 2254(a).  The court found that *Peyton* and *Garlotte*, which

-16-

apply expressly to consecutive sentences, were not controlling, but that the Supreme Court's decision in *Maleng* required dismissal. In so holding, the Tenth Circuit relied on a number of unpublished decisions, including one from the Sixth Circuit Court of Appeals, that stand for the proposition that "a habeas petitioner may *not* challenge an expired sentence that was imposed concurrently with the sentences that he or she continues to serve." 580 F.3d at 1140 n.1 (citing *Clark v. Russell*, No. 92-3097, 1992 WL 259355, at * 1 (6th Cir. Oct. 5, 1992)). On the authority of *Maleng*, *Clark*, and *Mays*, I conclude that this court lacks subject-matter jurisdiction to entertain a habeas corpus challenge to petitioner's conviction on either count of false pretenses, as his sentences had terminated by the time he filed his habeas corpus petition.

The court does have jurisdiction to entertain a habeas corpus challenge to counts 3 through 6. By the time he filed his habeas corpus action, petitioner had been released on parole on these sentences. The Supreme Court has held, however, that a person serving a term of parole suffers a sufficient deprivation of liberty such that he is "in custody" for purposes of section 2254(a). *Jones v. Cunningham*, 371 U.S. 236 (1963). Once federal jurisdiction has attached in the district court by the filing of a habeas petition, jurisdiction is not defeated by the release of the prisoner before completion of habeas corpus proceedings. *See Carafas v. LaValee*, 391 U.S. 234, 238 (1968). Thus, even though petitioner has now been discharged from parole and is free from any restraint on his liberty, this court continues to have jurisdiction to decide the challenges to counts 3 through 6 in the habeas corpus petition. The challenges to counts 1 and 2, however, must be dismissed for lack of subject-matter jurisdiction.

## II.     Federal Preemption

Petitioner unsuccessfully raised the defense of federal preemption in the Ingham County Circuit Court, the Michigan Court of Appeals, and the Michigan Supreme Court.  The trial court and Court of Appeals rejected preemption on its merits.  The principle of federal preemption is founded on the Supremacy Clause in Article VI of the United States Constitution.  The Supremacy Clause declares that the Constitution, and the laws of the United States made in pursuance thereof, "shall be the supreme Law of the Land."  Furthermore, the clause requires the "Judges in every State" to be bound thereby.  Petitioner's preemption defense is based upon an express preemption clause in the Federal Election Campaign Act, which provides that the provisions of that Act "supersede and preempt any provision of State law with respect to election to Federal office."  2 U.S.C. § 453(a).  Petitioner now seeks habeas corpus relief on the basis of federal preemption.  As stated above, this court lacks jurisdiction to adjudicate this defense with regard to counts 1 and 2, as petitioner was not in custody on those convictions at the time his petition was filed.  His challenge to counts 3 and 6 remains viable.

### A.     Preemption as a Ground For Habeas Corpus Relief

Habeas corpus relief is available to State prisoners who are held in custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a).  The Supreme Court has held that habeas corpus relief is available to a prisoner who is convicted for engaging in conduct that the law does not make criminal, as such a conviction violates due process.  *Davis v. United States*, 417 U.S. 333, 346-47 (1974); *see In re Hanserd*, 123 F.2d 922, 926 (6th Cir. 1997).  The Supreme Court has consistently recognized that a State law that conflicts with federal law is "without effect," beginning

with *McCulloch v. Maryland*, 4 Wheat. 316, 427 (1819), and continuing to the present, *see Cipollone v. Liggett Group, Inc.*, 506 U.S. 504, 516 (1992). For this reason, where federal law preempts State regulation, the States are disabled from enforcing criminal statutes. *See, e.g., Pennsylvania v. Nelson*, 350 U.S. 497 (1956) (reversing State conviction for sedition because Congress had preempted the field, even though State law was not inconsistent with federal act). Because a preempted State law is a nullity, a prisoner may seek habeas corpus relief under *Davis* on a preemption theory: "*Davis* holds that habeas corpus provides a remedy to a person who is convicted of engaging in conduct that is not criminal; and by virtue of the Supremacy Clause, a federal statute can nullify a state criminal statute and if it does so the State can no longer criminalize conduct within the federal statute's preemptive scope." *Corcoran v. Sullivan*, 112 F.3d 836, 838 (7th Cir. 1997); *accord Crow v. Wainwright*, 720 F.2d 1224 (11th Cir. 1983) (granting habeas corpus relief to criminal defendant because federal preemption rendered the conviction "null and void"). This court therefore has authority to review petitioner's challenge to counts 3 through 6 on grounds of federal preemption.

B.     The Elections Clause and Federal Election Campaigns Act

The Supreme Court has held that the States have no inherent authority to regulate elections to federal offices created by the Constitution. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804 (1995). Any State authority over federal elections "had to be delegated to, rather than reserved by, the States." *Id.* The Elections Clause of Article I delegates to the States the power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. CONST. art. I, § 4, cl. 1. "No other constitutional provision gives States authority over

congressional elections, and no such authority could be reserved under the Tenth Amendment." *Cook v. Gralike*, 531 U.S. 510, 523 (2001). "By process of elimination, the States may regulate the incidents of such elections, including balloting, only within the exclusive delegation of power under the Elections Clause." *Id.* The Elections Clause represents a grant of authority to the States to issue "procedural regulations," such as the time and place of elections and the prevention of fraud and corruption in the voting process. *Id.* at 523-24.

Even this limited delegation to the States of authority over federal elections is conditional. The Elections Clause vests in Congress the authority to override any State regulation except as to the place of choosing senators. U.S. CONST. art. I, § 4, cl. 1 ("but the Congress may at any time by Law make or alter such [State] Regulations, except as to the places of chusing Senators."). "The Elections Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). Thus, it is well established that the Elections Clause grants Congress the power to "override state regulations" by establishing uniform rules on federal elections, binding on the States." *Id.*[5]

The Federal Election Campaigns Act was passed in 1972, as the latest in a long series of congressional efforts (beginning under President Theodore Roosevelt) to control public campaign financing pursuant to the constitutional grant of authority under the Elections Clause. PUB. L. 92-225 (1972). In response to the Watergate scandal, Congress amended FECA in 1974. As amended, the FECA seeks to reform federal election campaigns in three major respects. First, the law imposes

---

[5] Art. II, § 1, cl. 3 gives Congress analogous power to regulate presidential elections. *See Buckley*, 424 U.S. at 14, n.16; *Burroughs v. United States*, 290 U.S. 534 (1934); *Foster*, 522 U.S. at 69 (Art. II, § 1, cl. 3 is the "counterpart for the Executive Branch" of the Elections Clause.)

-20-

a series of limitations on campaign contributions, as well as campaign expenditures.  The Supreme

Court scrutinized these provisions in the landmark case of *Buckley v. Valeo*, 424 U.S. 1 (1976).  The

*Buckley* Court affirmed the broad power of Congress to regulate federal elections under the Elections

Clause.  424 U.S. at 14.  The Court upheld the contribution limitations imposed by FECA but struck

down some spending limitations on First Amendment grounds and found that the method of

appointing members of the FEC violated separation of powers.[6]

       Second, and most germane to the present case, FECA extensively regulates "political

committees" (such as petitioner's PACs).  All political committees must be registered.  2 U.S.C. §

433.  Among other regulations, the FECA requires clarity concerning a PAC's affiliation or non-

affiliation with particular candidates, to prevent donor confusion.  In this regard, the FECA regulates

first the naming of political committees.  The Act requires each candidate for public office to

designate in writing a "principal campaign committee."  2 U.S.C. § 432(e)(1).  Candidates may

designate other committees as "authorized" subject to stated restrictions.  *Id.* at § 432(e)(1),

(e)(3)(A).  The name of each authorized committee *shall* include the name of the candidate

authorizing it.  *Id.* at § 432(e)(4).  In the case of a political committee that is not authorized by a

candidate, "such political committee shall not include the name of any candidate in its name."  *Id.*

       The second express regulation in this regard is contained in section 441d of the

FECA, which sets forth certain requirements for political advertising and solicitations, including

mailings.  Any such public communication that is paid for or authorized by a candidate or the

candidate's authorized committee must clearly so state.  2 U.S.C. § 441d(a)(1).  If the

---

[6] Congress immediately amended the FECA to cure the problems identified by the *Buckley* Court in the appointment process.  *See* FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1976, PUB. L. 94-283 § 101(a), 90 Stat. 475 (1976).

communication is not authorized by a candidate or the candidate's authorized political committee, it must clearly state the name, address and other identifying information of the person who paid for the communication "and state that the communication is not authorized by any candidate or candidate's committee." 2 U.S.C. § 441d(a)(3).[7]

The Act further requires political committees to keep detailed records of contributions and expenditures, 2 U.S.C. § 432(b)(2)(A) & (B), as well as requiring quarterly reports to the Federal Election Commission. 2 U.S.C. § 434(a). These quarterly reports are to contain detailed financial information, including the full name, mailing address, and other information of each person who has contributed over a threshold amount in a calendar year, as well as the amount and date of the contributions. 2 U.S.C. § 434(b). The FECA expressly provides that "any information copied from such reports or statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes." 2 U.S.C. § 438(a)(4).

Third, to enforce the Act, Congress created the eight-member Federal Election Commission. 2 U.S.C. § 437c. As explained by the Supreme Court, the Act vests the FEC with "primary and substantial responsibility for administering and enforcing the Act." *Buckley*, 424 U.S. at 109. As part of its administrative charge, the FEC acts as a "national clearinghouse" for information with respect to the administration of federal elections. *Id.* The Commission must file and index the reports submitted by those engaging in regulated political activities and must make them available for public inspection, subject to the express statutory prohibition against use for

---

[7] In *Citizens United v. FEC*, 130 S. Ct. 876, 913-17 (2010), the Court identified the purpose of these disclosure and disclaimer requirements as insuring that the voters are fully informed about the identity of the person or group who is speaking. "At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party." *Id.* at 915.

commercial or solicitation purposes. 2 U.S.C. § 438(a). The FECA delegates to the FEC "extensive rule-making and adjudicative powers." *Buckley*, 424 U.S. at 110. The Act expressly authorizes the Commission to "prescribe rules, regulations, and forms to carry out" the provisions of the Act. 2 U.S.C. § 438(a)(8). The FEC has promulgated extensive regulations pursuant to this delegated authority. 11 C.F.R. parts 1-9039. These rules implement virtually every aspect of the FECA. Germane to the present case, the FEC has promulgated regulations covering the naming of PACs, 11 C.F.R. § 102.14, the mandatory inclusion of disclaimers in public communications to identify clearly a PAC's affiliation or lack of affiliation with a candidate, 11 C.F.R. § 110.11, and the prohibition against use of FEC-published donor lists for commercial or solicitation purposes, 11 C.F.R. § 104.15.

The FECA erects an extensive system for enforcement of the Act and the FEC's regulations. Complainants alleging a violation of the FECA must file a complaint with the FEC. 2 U.S.C. § 437g(a)(1). If the FEC finds probable cause supporting a violation, it must first resort to informal corrective measures, such as conference and conciliation. 2 U.S.C. § 437g(a)(4). If informal methods fail, the FEC may institute a civil action for an injunction or a civil penalty. 2 U.S.C. § 437g(a)(6); *see also* 11 C.F.R. part 111 (FEC regulations governing the administrative process). If the FEC dismisses a complaint or fails to act within 120 days, the complainant may initiate a civil action in the District of Columbia to remedy the violation. 2 U.S.C. § 437g(a)(8). The Supreme Court has remarked that the FECA invests in the FEC "primary and substantial responsibility for administering and enforcing the Act." *Buckley*, 424 U.S. at 109.[8]

---

[8] The FECA also creates criminal sanctions for wilful violations of the Act, subject to certain affirmative defenses. 2 U.S.C. § 437g(12)(d).

As originally enacted in 1972, the FECA contained a "savings clause" for State laws regulating elections. The 1972 version of FECA provided: "Nothing in this Act shall be deemed to invalidate or make inapplicable any provision of any State law, except where compliance with such provision of law would result in a violation of a provision of this Act." FEDERAL ELECTION CAMPAIGN ACT OF 1971, PUB. L. No. 92-225, § 403(a), 86 Stat. 3, 20 (1972). In the 1974 amendments to FECA, Congress repealed the savings clause in favor of a broad preemption clause:

> Subject to subsection (b) of this section [dealing with office buildings of state and local committees of political parties], the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office.

2 U.S.C. § 453(a). The report of the House of Representatives Committee that drafted this provision stated: "It is the intent of the Committee to make certain that Federal law is construed to occupy the field with respect to elections to federal office and that the Federal law will be the sole authority under which such elections will be regulated." H.R. REP. No. 1239, 93d Cong. 2d Sess. 10-11 (1974). The report of the Conference Committee that reconciled House and Senate versions of the bill adopted the House preemption language, describing its preemptive effect as follows:

> The conference substitute follows the House amendment. It is clear that the Federal law occupies the field with respect to reporting and disclosure of political contributions to and expenditures by Federal candidates and political committees, but does not affect State laws as to the manner of qualifying as a candidate or the dates and places of elections.

S. CONF. REP. No. 1237, 93d Cong. 2d sess. (1974) (*reprinted in* 1974 U.S.C.C.A.N. 5618, 5668). The Conference Committee apparently thought it wise to acknowledge the constitutional role of the states in establishing the qualification for electors and the dates and places of elections and to eschew any intent to preempt the State's constitutional roles in these limited areas. *See*, *e.g.*, U.S. CONST.

art. I, § 2 (States establish the qualifications for electors to the House), § 4 (States establish the times, places, and manner of holding elections for the House and Senate, but Congress may alter such regulations, "except as to the Places of chusing Senators"), amend. XVII (States establish qualifications for electors of senators).

The FEC, acting pursuant to its rulemaking authority created by FECA, adopted a regulation that essentially mirrors the scope of preemption identified in the Conference Committee report:

EFFECT ON STATE LAW

(a)    The provisions of the Federal Election Campaign Act of 1971, as amended, and rules and regulations issued thereunder, supersede and preempt any provision of State law with respect to election to Federal office.

(b)    Federal law supersedes State law concerning the --

(1)    Organization and registration of political committees supporting Federal candidates;

(2)    Disclosure of receipts and expenditures by Federal candidates and political committees; and

(3)    Limitation on contributions and expenditures regarding Federal candidates and political committees.

(c)    The Act does not supersede State laws which provide for the --

(1)    Manner of qualifying as a candidate or political party organization;

(2)    Dates and places of elections;

(3)    Voter registration;

(4)    Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

(5)     Candidate's personal financial disclosure; or

(6)     Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

11 C.F.R. § 108.7.  In accordance with the requirements of the FECA, 2 U.S.C. § 438(d), the FEC submitted this regulation to Congress in 1977.  Congress did not disapprove the regulation, and it took effect on April 13, 1977.

C.     The State Prosecutions Were Preempted by the FECA

By the time the Michigan Court of Appeals issued its decision in May 2005, the Supreme Court of the United States had clearly established the principles governing the analysis of federal preemption of State laws.  The Court has identified three broad types of federal preemption. The first is express preemption, which occurs when Congress has in express terms declared its intent to preclude State regulation in a given area.  Express preemption is generally found when Congress enacts a preemption clause, explicitly declaring the preeminence of federal law in a given regulatory area.  *See, e.g., Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 95-101 (1983).  The second type of preemption arises when Congress has legislated so pervasively in an area that the courts can imply an intent to "occupy the field."  *See Jones v. Rath Packing Co.*, 430 U.S. 519 (1977).  In such circumstances, Congress leaves no room for supplementary State regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  The third type of preemption occurs where Congress has not entirely displaced State regulation, but where State law actually conflicts with federal legislation.  *See International Paper Co. v. Ouelette*, 479 U.S. 481, 491 (1987).  "Conflict preemption" can arise in one of two ways -- when compliance with both federal and State laws is

impossible, or when a State law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984).

This case involves the first type of preemption:  express preclusion of State regulation.  By virtue of the FECA's express preemption clause, the Act and its regulations "supersede and preempt *any* provision of State law with respect to election to Federal office."  2 U.S.C. § 453(a) (emphasis added).  The Supreme Court has held that such a broad preemption clause "entirely" governs the preemptive scope of a federal law:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of Congressional intent with respect to state authority," "there is no need to infer Congressional intent to pre-empt State laws from the substantive provisions" of the legislation.

*Cipollone*, 505 U.S. at 517 (citations omitted).  In such a case, there is no need to look beyond the preemption clause.  *Id.*  Rather, the court must "identify the domain expressly preempted" by the clause.  *Id.*

The first task of any court faced with an express preemption clause, therefore, is to "identify the domain expressly pre-empted."  *Cipollone*, 505 U.S. at 517.  This inquiry starts with the plain language of the preemption clause.  *See Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004).  The language of FECA's preemption clause is broad and evinces a Congressional intent to "supersede and preempt" all State laws "with respect to election to Federal office."  2 U.S.C. § 453(a).  The only stated exception relates to the purchase and construction of office buildings by State and local committees. 2 U.S.C. § 453(b).  When faced with such broad preemption language in similar contexts, the Supreme Court has found a Congressional

intent to occupy the field of regulation falling within the scope of the statute.  *See, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (preemption clause of the Airline Deregulation Act (ADA), which displaces all State laws "relating to" rates, routes or services of air carriers preempted State laws governing content of airline fare advertising); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-40 (1990) (preemption clause in ERISA superseding State laws "relating to" benefit plans precluded a State common-law claim that an employee was wrongfully discharged to prevent his attainment of benefits under a plan covered by ERISA).  Congress's use in the FECA of the words "with respect to" was at least as expansive as its use of "relating to" in ERISA and the ADA.  In such circumstances, all State regulations falling within the sphere of preemption, whether consistent or inconsistent with federal law, are displaced.  *See Morales*, 504 U.S. at 187; *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 829 (1988).

The court, however, must also consider the FEC regulation addressing the scope of preemption.  A unanimous Supreme Court has squarely held that an agency's regulation defining the scope of preemption must be followed in the absence of a clear indication from the statute itself or its legislative history that Congress would not have sanctioned the scope of preemption.  *City of New York v. F.C.C.*, 486 U.S. 57, 63-64 (1988); *accord Geier v. American Honda Motors Co.*, 529 U.S. 861, 883 (2000).  The FEC regulation identifies the scope of preemption as co-extensive with the scope of those subjects expressly covered by the FECA.  Thus, state law is displaced when it concerns the organization and registration of political committees supporting federal candidates, disclosure of receipts and expenditures by political committees, and limits on campaign contributions and expenditures by political committees.  11 C.F.R. § 108.7(b).  In those areas not addressed by FECA -- including the dates and place of elections and voter registration -- State law is not

preempted. *Id.* at § 108.7(c). This dichotomy recognizes the constitutional delegation of certain defined areas to State control. It is also consistent with FECA's legislative history, and especially the Conference Committee report, which drew a similar distinction. *See Bunning v. Kentucky*, 42 F.3d 1008, 1012 (6th Cir. 1994) (relying on 11 C.F.R. § 108.7 and the Conference Committee Report to define the scope of FECA preemption).

Even as thus narrowed, the preemptive effect of section 453(a) certainly covers Michigan's attempts to criminalize, through laws of general applicability, the use by a federally regulated PAC of a candidate's name in solicitations for a Presidential election, and the misuse of donor lists published by the FEC. Both of these areas of conduct are expressly governed by the FECA and the FEC's regulations.

The common-law fraud charges (counts 3 and 4) were based on the theory that petitioner victimized the Bush and Gore campaigns by using the names of the candidates in solicitation letters and in offering donors a chance to win tickets to events containing the candidates' names: (the "Al Gore Inaugural Ball Gala Event" and the "George W. Bush Inaugural Ball Gala Event"). In the words of the criminal Information, these letters were "intentionally misleading" in that they "imply affiliation" with the efforts of the national parties to elect George Bush and Al Gore in 2000. The Assistant Attorney General asserted in final argument that such use of candidates' names in solicitations was "against the rules," expressly referring to "FEC rules." (TT III, 537, 543-44). The Michigan Court of Appeals rejected a challenge to the sufficiency of the evidence on the ground that it was not proper for a PAC to use a candidate's name in its solicitations, under an FEC guidebook, and that the campaigns suffered a loss as a result of an illegal solicitation. 705 N.W.2d at 174-75.

-29-

By prosecuting petitioner for allegedly unlawful use of a candidate's name, the Michigan Attorney General intruded into territory directly covered by the FECA and its regulations and therefore preempted under § 453(a).  The FECA directly addresses use of a candidate's name by an unauthorized PAC:  the candidate's name may not be used in the name of the PAC.  2 U.S.C. § 432(b)(4).  The FEC's regulations are even more explicit:

> (a)     The name of each authorized committee shall include the name of the candidate who authorized such committee.  Except as provided in paragraph (b) of this section, no unauthorized committee shall include the name of any candidate in its name.  For purposes of this paragraph, "name" includes any name under which a committee conducts activities, such as solicitations or other communications, including a special project name or other designation.

11 C.F.R. § 102.14(a).  The prosecution relied on this regulation in arguing that petitioner's use of the candidates' names was unlawful.

Congress and the FEC have addressed the problem of voter and donor confusion that was the subject to the Michigan Attorney General's efforts in prosecuting counts 3 and 4 for common-law fraud.  The FECA requires that non-authorized PACs, such as petitioner's, include in all their public communications an express disclaimer informing the public that the communication "is not authorized by any candidate or candidate's committee."  2 U.S.C. § 441d(a)(3).  The FEC regulations reinforce and elaborate on the disclaimer requirement.  11 C.F.R. 110.11.[9]

---

[9] In this regard, the reading of the FECA promoted by the Michigan Attorney General, accepted by the jury, and endorsed by the Michigan Court of Appeals, was flatly wrong.  Contrary to the AG's arguments, the FECA nowhere prohibits a PAC's use of a candidate's name in its solicitations.  The right of a PAC, like any other person, to refer to the name of a candidate without the candidate's consent is protected by the First Amendment.  *See Friends of Phil Gramm v. Americans for Phil Gramm*, 587 F. Supp. 769, 774 (E.D. Va. 1984).  For this reason, the FECA cannot and does not forbid all use of a candidate's name by a PAC.  Rather, it takes a more tailored approach, by requiring a disclaimer.  If Michigan fraud law indeed restricts a PAC from all use of a candidate's name, it conflicts with both the First Amendment and the FECA.  Finding such a conflict, however, is not necessary in this case, because of the existence of an express preemption

In most areas of criminal law, the rule is concurrent federal and State jurisdiction. By legislating in a particular area, Congress generally does not mean to displace concurrent State enforcement of its own laws. But this presumption is subject to the preemptive powers of Congress under the Supremacy Clause. Where, as here, Congress expressly states its intention to exclude State regulation, then concurrent jurisdiction is no longer the rule. *See Pennsylvania v. Nelson*, 350 U.S. at 500-01. All State regulation, whether consistent or inconsistent, is preempted. *Morales*, 504 U.S. at 387. If the preemption clause of the FECA, which expressly preempts "any state law" with respect to election to federal office, means anything, it means that a State cannot charge an individual with common-law fraud arising from his use of candidates' names in a public communication, an area directly regulated by the FECA.

The preemption of counts 5 and 6, charging larceny by conversion, is even more patent. The subject matter of the conversion was donor lists, reported to the FEC by virtue of federal statutory requirement and published by the FEC under the authority of the same federal law, the FECA. 2 U.S.C. § 438(a)(4). The only reason that the Michigan Attorney General could assert that the national parties had an "intellectual property" interest in these lists (*see* TT III, 545), capable of being converted, is that the very same FECA forbids the use of any information contained in these lists "for the purpose of soliciting contributions or for other commercial purposes." 2 U.S.C. § 438(a)(4); *see also* 11 C.F.R. § 104.15. The Attorney General openly based his conversion case on the FECA statutory prohibition against commercial use. (TT III, 545, 548, 558). The Michigan Court of Appeals relied on warnings found in the "FEC guide and website" that "these lists were not to be used for solicitation purposes." 705 N.W.2d at 174-75.

---

clause displacing "any" state law, whether or not it conflicts with FECA.

By virtue of the preemption clause in § 453(a), Michigan's ability to criminalize a misuse of FEC-maintained donor lists was clearly displaced.  The larceny by conversion charges were merely a method for the Attorney General to enforce the prohibitions against use of FEC donor lists contained in section 438(a)(4) of the FECA, which the prosecution explicitly relied on.  The narrowest preemptive effect that can be accorded to section 453(a) is the displacement of "any" State law that covers the very same subject matter as FECA itself.  Petitioner's alleged misuse of federally compiled and federally protected donor lists was a matter for the FEC, not a county jury.

> D.    Decision of the Michigan Court of Appeals
>        Was Objectively Unreasonable

Because the Michigan Court of Appeals ruled directly on petitioner's preemption defense, its decision must be accorded deference under AEDPA.  *See Premo v. Moore*, 131 S. Ct. 733, 739 (2011).  The state court adjudication can be overturned only if it is contrary to clearly established federal law as enunciated by the Supreme Court or represents an unreasonable application of Supreme Court precedent.  28 U.S.C. § 2254(d).  This standard is decidedly "difficult to meet," as it requires that the State-court decision not merely be incorrect, but that it be "objectively unreasonable."  *See Harrington v. Richter*, 131 S. Ct. 770, 785-86 (2011).  AEDPA deference, however, does not preclude relief.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  The decision of the Michigan Court of Appeals is so patently incorrect and so devoid of analysis and attention to Supreme Court principles that it qualifies as "objectively unreasonable" under the AEDPA standard.  The published decision of the Michigan Court of Appeals rejected petitioner's preemption defense with virtually no analysis and made no attempt to apply clearly established Supreme Court precedent.

The panel decision recognized the three general kinds of preemption, but failed to discern that this case involves the strongest type -- express preemption. 705 N.W.2d at 175. The court then stated that there is a presumption against preemption, which can be overcome only by a clear and unequivocal expression of intent to preempt by Congress, and that a party claiming preemption faces a heavy burden where State law falls within a traditional area of State police power. *Id.* These general observations were correct, but completely inapplicable to the present case. The Supreme Court has recognized a presumption against preemption, especially in cases which Congress has "legislated in a field which the States have traditionally occupied." *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The Court, however, has expressly held that the presumption applies only when Congress legislates in an area traditionally reserved for the exercise of the States' police power. The presumption does not apply in areas reserved for federal regulation. *See United States v. Locke*, 529 U.S. 89, 107-08 (2000). "As *Rice* indicates, an 'assumption of nonpre-emption is not triggered where the State regulates in an area where there has been a history of significant federal presence." *Id.*; *accord Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (no presumption against preemption in areas not traditionally occupied by States). It is hard to imagine an area more clearly within the historic purview of Congress than regulation of federal elections, which are entrusted to Congress by the Constitution itself. U.S. CONST. art. I, § 4, cl. 1. "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals . . . ." *Barnes v. Glenn Theater, Inc.*, 501 U.S. 560, 569 (1991). The police power was not conferred on the States by the Constitution, but preexisted the formation of the Union and was guaranteed to the States by the Tenth Amendment. *See U.S. Term Limits*, 514 U.S. at 801; *Bute v. Illinois*, 333 U.S. 640, 650-51 (1948). The power to regulate federal elections,

however, *never* inhered in the States.  Rather, as explained by the Supreme Court, authority was delegated to the States by the Elections Clause, and is subject to the plenary power of Congress to override State regulation.  *See U.S. Term Limits*, 514 U.S. at 804.  The Elections Clause contains its own automatic preemption principle.  The Michigan Court of Appeals therefore committed a fundamental error by assuming that the power to regulate the content of solicitations related to a federal election ever fell within the police power of the State of Michigan.  The States have authority in this area only if Congress has not exercised its authority under the Elections Clause.  *Foster*, 522 U.S. at 69.  In passing the FECA, Congress did exercise such authority, expressly displacing State law.  The presumption against preemption, and the imposition of a "heavy burden" upon petitioner in this case, were contrary to clearly established Supreme Court authority.

The Michigan Court of Appeals next quoted the language of the preemption clause of the FECA, but failed to recognize that it establishes express preemption.  As a consequence of this failure, the court ignored the central duty of any court faced with an express preemption clause, namely, to "identify the domain expressly preempted."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (quoting *Cipollone*, 505 U.S. at 517).  The panel made no effort to examine the scope of the FECA to determine the subject matter covered or the objects of the legislation.  In fact, the panel did not even acknowledge the breadth of the preemption language of section 453(a) or make any effort to discern its meaning or scope.  Furthermore, the panel ignored 11 C.F.R. § 108.7, the FEC regulation which delineates a scope of preemption covering the present case.  Clearly established Supreme Court authority requires that such agency regulations addressing the scope of preemption be given controlling effect, in the absence of a clear indication in the statute or legislative history to the contrary.  *City of New York*, 486 U.S. at 63-64.  Resort to the FEC regulations would

have demonstrated that the subject matter of counts 3 through 6 fell squarely within preempted areas and did not fall within those regulatory areas reserved to the States.

Rather than examining the FECA itself, or resorting to the dispositive FEC regulation on the subject, the panel immediately dismissed the statute's broad language by relying on two federal appellate decisions stating that section 453 should be given a "narrow preemptive effect in light of its legislative history." 705 N.W.2d at 175 (quoting *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280 (5th Cir. 1994) and *Stern v. General Elec. Co.*, 924 F.2d 472, 475 n.3 (2d Cir. 1991)). If the Michigan Court of Appeals had surveyed the totality of federal appellate decisions in this area, it would have recognized that the quoted language from the *Karl Rove* case has no application to the present dispute. The federal appellate courts find preemption whenever state law intrudes directly into an area regulated by FECA. In *Bunning v. Commonwealth of Kentucky*, 42 F.3d 1008 (6th Cir. 1994), the Sixth Circuit held that section 453(a) preempted a Kentucky law purporting to regulate a poll conducted by a Congressman's federal election committee to test the effectiveness of advertising conducted during a federal campaign. The *Bunning* court relied on the broad preemptive language of section 453, as well as the effect of the FEC regulation, 11 C.F.R. § 108.7, and the statements by the Conference Committee of Congress's intent to occupy the field with respect to reporting and disclosure of political contributions. 42 F.3d 1012. In *Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993), the Eighth Circuit found a State law establishing a system of public funding for U.S. Congressional candidates was preempted, because it fell "squarely within the boundaries of the preempted domain." In *Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996), the Eleventh Circuit reviewed a Georgia statute prohibiting any member of the General Assembly from accepting contributions for a political campaign while the Assembly was in session. Suit was brought by a member of the

-35-

General Assembly who was contemplating a campaign for federal office. The court found that the State law was preempted. Circuit Judge Carnes relied on the express language of the preemption clause, finding that the State statute intruded into the area regulated by FECA and the Federal Election Commission. 82 F.3d at 999. Judge Kravitch reached the same result by relying on the statute as well as the FEC regulation. *Id.* at 993-99. For both judges, the touchstone was the breadth of the preemption clause and the State's attempt to intrude within a federally regulated area. Finally, in *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F. Supp. 769 (E.D. Va. 1984), the court squarely held that section 453(a) preempts a state-law cause of action for unauthorized use of a candidate's name in a committee's name, because the FECA directly regulates such conduct.

The cases relied on by the Michigan Court of Appeals lie outside the periphery of the matters governed by the FECA. The *Karl Rove* case was a state-law breach of contract action against a candidate, seeking to hold him personally liable for campaign expenses. The candidate asserted preemption, a defense rejected by the Fifth Circuit. The court held that the question of a candidate's personal liability was not addressed by "the text of FECA or accompanying regulations." 39 F.3d at 1280. The court also noted that the FEC itself had opined that "state law supplies the answer to the question who may be held liable for campaign committee debts." *Id.* As the FECA was "silent" on the issue of candidate liability, the court found no preemption. *Id.* at 1280-81. The other cited case, *Stern v. Gen'l Elec. Co.*, likewise dealt with an area of conduct outside the scope of the FECA. The question in *Stern* was whether a corporation's political contributions could be challenged as corporate waste. 924 F.2d at 474-75. The Second Circuit found against preemption, because the FECA does not purport to regulate the relationship between a corporation and its shareholders with regard to campaign contributions. *Id.* The present case contrasts markedly with both *Karl Rove* and

-36-

*Stern*, because the conduct that the State of Michigan attempted to criminalize falls directly and completely within the scope of the FECA, as evidenced by the prosecutor's need to argue to the jury that petitioner's conduct was wrongful precisely because it violated federal rules.[10]

If the Michigan appellate panel had made any objectively reasonable effort to determine the scope of preemption, it would have discerned a clear pattern.  The federal courts give the FECA a broad preemptive effect in those areas directly addressed by the Act and FEC regulations.  State regulation in areas not covered by the FECA, by contrast, is not preempted.  The appellate panel cited only those cases dealing with conduct outside the scope of the FECA and ignored more important cases, such as the Sixth Circuit decision in *Bunning*, showing a broad preemptive effect in areas directly regulated by the FECA.  And if the Michigan court had been interested in the closest federal case, it would have seen that a federal district court had already ruled that a fraud claim against a PAC based on the PAC's use of a candidate's name in its solicitation is preempted.  *Friends of Phil Gramm*, 587 F. Supp. at 772-73.  Rather than analyzing the breadth of federal decisions in this area, the appellate court chose to quote language from the most inapposite cases, reading those cases as essentially consigning FECA's preemption clause to oblivion.  Failing to follow Supreme Court principles in favor of inapposite lower court rulings was objectively unreasonable.

---

[10] To the extent that *Karl Rove* and *Stern* based their holdings on a presumption against preemption, these cases were no longer good law on that subject by 2005.  By then, the Supreme Court had made it clear that such a presumption only applies in areas falling within the traditional police powers of the States.  *See Locke*, 529 U.S. at 107-08.  The Court had also ruled, more than once, that the States have no police power over federal elections.  *See, e.g., U.S. Term Limits*, 514 U.S. at 804.

The Michigan Court of Appeals next cited four federal lower-court cases for the proposition that Congress did not intend the FECA to be a substitute for all other possible criminal sanctions. 705 N.W.2d at 175. Incredibly, the appellate panel failed to discern that each of the cited cases represented a *federal* criminal prosecution and that the preemption clause of the FECA was therefore not an issue. In each of the cited cases, the federal courts held that the U.S. Attorney was not limited to bringing an FECA charge but could bring mail fraud and other prosecutions from conduct connected with a political campaign. The Michigan Court of Appeals' reliance on these cases was worse than unreasonable, as they had nothing to do with federal preemption. The mere fact that the federal government may bring charges other than those under the FECA does not allow the States to do likewise, in derogation of the broad preemption clause of section 453(a).

Finally, the Michigan Court of Appeals remarked that the crimes for which petitioner was prosecuted "are not specifically preempted" by section 453(a) and that no part of the FECA expressly preempts pursuit of criminal charges brought against a factual background that involves an election. 705 N.W.2d at 175. This remark discloses a complete refusal to apply the language of the preemption clause, which "supersede[s] and preempt[s] *any* provision of State law with respect to election to federal office." 2 U.S.C. § 453(a) (emphasis added). The remark that Michigan State law crimes are not "specifically preempted" by the FECA is fatuous. Congress is not required to list every State law that it intends to displace. The use of the word "any" more than suffices.

Finally, the Michigan Court of Appeals remarked that there is "no conflict between State and Federal law in this area." 705 N.W.2d at 175. Again, this comment is unadorned by any

analysis or attempt to discern what conduct is or is not governed by federal law.[11]  The mistake is fundamental.  The FECA contains an express preemption clause.  Therefore, no conflict is necessary as a predicate for a finding of preemption.  All State law within the scope of the preemption clause, consistent or inconsistent, is displaced.

This prosecution represented an unfortunate foray by the Michigan Attorney General into an area directly regulated, and preempted by, federal law.  In such circumstances, it is incumbent on the State judiciary to enforce federal law, by virtue of the express direction of the Supremacy Clause.  U.S. CONST. art. VI, cl. 2.  Both Circuit Judge Collette and a panel of the Michigan Court of Appeals dismissed petitioner's preemption defense out of hand, without real analysis.  The decision of the Michigan Court of Appeals ignored virtually every principle established by the Supreme Court to govern preemption analysis, preferring to rely on inapposite lower court cases or legal nonsequitors.  The appellate court made no effort to engage the language of the FECA to determine its scope and essentially refused to give its preemption clause any effect.  The court also studiously ignored a federal regulation, enacted by the agency entrusted with oversight of federal election campaigns.  The decision of the Michigan Court of Appeals is indefensible, and petitioner is entitled to habeas corpus relief.

### III.    Remedy

At the time he filed this habeas corpus action, petitioner was on parole for his fraud and larceny by conversion convictions.  This restraint on his liberty was sufficient to satisfy the "in-custody" requirement for habeas corpus jurisdiction.  *See Jones v. Cunningham*, 371 U.S. at 241-42.

---

[11] As explained in footnote 9 above, there was indeed a patent conflict between the theory of the prosecution's fraud case and the requirements of the FECA.

Since that time, he has been discharged from parole. Once habeas corpus jurisdiction attaches, a petitioner's unconditional release from all state custody does not moot the case. *See Spencer v. Kemma*, 523 U.S. 1, 7-8 (1998); *Carafas v. LaVallee*, 391 U.S. 234, 237 (1968). This rule recognizes the concrete collateral consequences that result from a wrongful conviction, even after release from custody. *Carafas*, 391 U.S. at 237-38. A petitioner is not required to identify or prove specific collateral effects, because the Supreme Court is "willing to presume that a wrongful criminal conviction has continuing collateral consequences." *Spencer*, 523 U.S. at 7-8. The only exception is where a petitioner is challenging his sentence alone, rather than his conviction. *See Gentry v. Deuth*, 456 F.3d 687, 693-95 (6th Cir. 2006). Where, as here, the petitioner challenges the constitutionality of the conviction itself, the law requires no proof of collateral consequences, as they are "patently obvious." *Id.* at 694; *accord Gall v. Scroggy*, 603 F.3d 346, 352 (6th Cir. 2010) (ongoing collateral consequences are presumed to flow from an unconstitutional conviction).

     *Gentry v. Deuth* is the leading Sixth Circuit case on habeas relief after a petitioner's release from custody. In *Gentry*, the petitioner filed her habeas corpus action six months before the expiration of her prison sentence. 456 F.3d at 690. The district court ultimately found that petitioner's rights under the Confrontation Clause had been violated and issued a conditional writ, requiring a retrial within ninety days. The Commonwealth chose not to retry petitioner, who moved for the entry of an absolute writ nullifying the conviction and expunging her record. *Id.* at 691. The court held that expungement of an unconstitutional conviction is the "essential relief" available to a habeas petitioner after her sentence has expired. *Id.* at 695. In *Gall v. Scroggy*, the court reaffirmed this holding:

If the petition is well-taken, then the necessary remedy is relief from both the direct and collateral consequences of the unconstitutional conviction. It follows that, because ongoing collateral consequences are assumed to flow from an unconstitutional conviction, and because the full relief implied by the writ is elimination of all direct and indirect consequences, *nullification of the conviction and expungement of the conviction from one's record are naturally and necessarily implicit in granting the writ*.

603 F.3d at 352 (emphasis added).

As petitioner has completely served his sentence and is free from all physical restraint, the only relief available is the issuance of a writ of habeas corpus requiring nullification of his convictions on counts 3 through 6 and expungement of the record of these convictions.

## Recommended Disposition

For the foregoing reasons, I recommend that petitioner's challenge to counts 1 and 2 (obtaining money by false pretenses) be dismissed for lack of subject-matter jurisdiction. I further recommend that petitioner be granted a writ of habeas corpus on counts 3 and 4 (common-law fraud) and counts 5 and 6 (larceny by conversion) on the ground of federal preemption and that his convictions on these counts be vacated and the record expunged.

Dated:   January 9, 2012               /s/  Joseph G. Scoville
                                        United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).